ANTHONY P. MILLER, INC., PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 6666.    Promulgated September 17, 1946.

*S. Leo Ruslander, Esq.*, for the petitioner.
*William D. Harris, Esq.*, for the respondent.

738

OPINION.

*Compensation Issue.*

HILL, *Judge*: Respondent contends that the provisions of section 24 (c) of the Internal Revenue Code operate to prevent petitioner from deducting as a business expense the amount of $42,000, bonus and salary, received by Miller for his services during 1940.   Section 24 (c) provides as follows:

SEC. 24. ITEMS NOT DEDUCTIBLE.

*   *   *   *   *   *   *

(c) UNPAID EXPENSES AND INTEREST.—In computing net income no deduction shall be allowed under section 23 (a), relating to expenses incurred, or under section 23 (b), relating to interest accrued—

(1) If such expenses or interest are not paid within the taxable year or within two and one half months after the close thereof; and

(2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and

(3) If, at the close of the taxable year of the taxpayer or at any time within two and one half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under section 24 (b).

Section 24 (b), referred to in subsection (3) of the above quotation, is set out, as here material, in the margin.[2]

The three conditions specified by section 24 (c) must coexist to prevent a deduction otherwise allowable under section 23. *Michael Flynn Manufacturing Co.*, 3 T. C. 932.

The record establishes that Miller and his family were the controlling stockholders of petitioner. We are not told the value of such stock or the distribution thereof. In the absence of any positive showing to the contrary, we assume that subsection (3) of section 24 (c) applies in the instant case. The respondent so determined and petitioner does not contend otherwise.

We also think that subsection (2) of section 24 (c) is here applicable. The fact that Miller included such compensation in his income tax return for 1940 does not affect the merits of the controversy before us. Within the meaning of section 24 (c), deductibility by petitioner of the item in question is not determinable by what Miller may or may not have done in respect of reporting such item for income tax purposes. The application of section 24 (c) (2) depends solely upon whether the item sought to be deducted by petitioner was includible for tax purposes in Miller's income for the year of its deduction. *J. H. Martinus & Sons* v. *Commissioner*, 116 Fed. (2d) 732, and *McDuff Turner*, 5 T. C. 1261. From the record it appears that Miller, on behalf of petitioner, determined the amount of his compensation for 1940 and that such amount was accrued on petitioner's books in that year. However, we are given no detailed information with regard to the manner in which the compensation was authorized. No corporate resolutions, minutes, memoranda, or records are in evidence to show that such compensation was unconditionally authorized and made available to Miller under circumstances which would have required him to include such compensation in his income for 1940. There is nothing in the record to justify our assuming that the amount accrued on petitioner's books was credited to Miller's account rather than

---

[2](b) LOSSES FROM SALES OR EXCHANGES OF PROPERTY.—

(1) LOSSES DISALLOWED.—In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—

\*   \*   \*   \*   \*   \*   \*

(B) Except in the case of distributions in liquidation, between an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

\*   \*   \*   \*   \*   \*   \*

(2) STOCK OWNERSHIP, FAMILY, AND PARTNERSHIP RULE.—For the purposes of determining, in applying paragraph (1), the ownership of stock—

\*   \*   \*   \*   \*   \*   \*

(B) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family;

\*   \*   \*   \*   \*   \*   \*

(D) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; \* \* \*

merely debited to some expense account. The notes, one dated December 30, 1940, and the other January 1, 1941, were not delivered to Miller until January 1, 1941, and were paid December 31, 1942. The note transactions indicate an understanding which negatives constructive receipt. Under these circumstances it can not be held that such compensation was constructively received by Miller in 1940 and, hence, includible in his income for that year.

Believing as we do that subsections (2) and (3) of section 24 (c) apply in the instant case, we are presented with the single question of whether subsection (1) applies. Respondent contends that subsection (1) applies. Respondent argues that the compensation was not "paid" by petitioner within the meaning of subsection (1) by the execution and delivery to Miller of notes therefor. Petitioner contends that the delivery of the notes on January 1, 1941, constituted payment, citing *Musselman-Hub-Brake Co.* v. *Commissioner*, 139 Fed. (2d) 65, and other similar cases. It is not contended that there was payment otherwise.

With due respect to the Circuit Court of Appeals for the Sixth Circuit, which decided the *Musselman* case, we believe its interpretation of section 24 (c) as therein given does not reflect the intent of Congress and we here respectfully record our disagreement with the holding that the facts in that case constituted payment within the meaning of such section.

The applicability of subsection (1) depends on whether the compensation involved was "paid" within the meaning of such subsection by giving Miller the notes on January 1, 1941.

Section 24 (c) was first enacted in the Revenue Act of 1937. The principal purpose of adding this section is evident from its legislative history.[3] Deductions were being taken by certain classes of debtors using the accrual method of accounting. These debtors took the deductions in the years of accrual. The amount of the deduction would not be includible in the cash basis creditor's income until actually received. When the creditor bore a certain relationship to the debtor, control and abusive manipulation of the time of receipt, if ever, by such creditor was possible and frequently exercised. Thus, the Government was in the position of permitting deductions to debtors for accrued items on which income tax was avoided altogether by the cash creditor or postponed to a taxable year selected by the creditor as being most advantageous to him taxwise. It was thought that section 24 (c):

\* \* \* should serve to stimulate reasonably prompt payment of such accrued expenses in order that the debtor may secure the allowance of the deduction.

---

[3] See Report of Joint Committee on Tax Evasion and Avoidance, House Document 337, 75th Cong., 1st sess., p. 15; Report of Committee on Ways and Means, House Report 1546, 75th Cong., 1st sess., p. 29; Report of Finance Committee, Senate Report 1242, 75th Cong., 1st sess., p. 31.

No hardship should result from the requirement that the amount be paid within 2½ months after the close of the year of accrual since expenses of this nature usually should be paid within that time in the ordinary course of business. While this restriction would be applicable only to individuals and corporations in relationships covered by section 24 (a) (6), this class represents the worst offenders in the use of this loophole.

Report of Joint Committee on Tax Evasion and Avoidance, *supra* (footnote 3), p. 16.

It is our view that the word "paid" as used in section 24 (c) (1) means paid in actuality in cash or its equivalent and that the giving of one's own note for one's obligation is not such payment. Giving a note is not the equivalent of payment in cash, nor is it constructive payment. The word "paid" has an accepted and customary meaning of paid in cash or its equivalent, and we have no doubt that such was the meaning of its employment in the enactment of section 24 (c) (1), since such meaning appears necessary to effectuate the purposes and objectives of that enactment.

We consider it important to point out a distinction between the requirements of subsection (1) and subsection (2). In determining that section 24 (c) (2) applies to a taxpayer on the accrual basis, constructive receipt by a creditor on the cash basis of the amount of an accrued obligation of such taxpayer in the year of its accrual is an important factor, but actual or constructive payment is not essential. For the determination that section 24 (c) (1) applies, however, it is not enough that there was constructive receipt by the taxpayer. Even if constructive payment were considered as within the meaning of "paid" as used in subsection (1), constructive receipt by the taxpayer would not be determinative of constructive payment. As we said in *P. G. Lake, Inc.*, 4 T. C. 1; affd., 148 Fed. (2d) 898:

Petitioner, arguing from the *Michael Flynn Manufacturing Co.* case, contends that the amount here in question was constructively received prior to March 15, 1940, wherefore, it must be held to have been likewise paid within that period. However, the fact that an amount is deemed to have been constructively received does not compel the conclusion that it was also "paid" within the meaning of the statute. *Cox Motor Sales Co.*, 42 B. T. A. 192. Nor does the *Michael Flynn Manufacturing Co.* case suggest that an amount includible in gross income under subdivision (2) is to be considered "paid" under subdivision (1). * * * [Emphasis supplied.]

In the administration of the revenue acts payment (constructive or otherwise) is not the legal corollary of constructive receipt. In other words, for the purposes of the revenue acts, payment is not established merely by the establishment of constructive receipt. There are valid reasons why payment as the basis of a deduction does not follow from the holding that the item sought to be deducted was constructively received by an obligee. Deductions are available only if authorized by legislation and then upon the conditions prescribed. On the other

hand, it is mandatory that a taxpayer on the cash basis of accounting report his taxable income for the year received, and for tax purposes income is held to have been received when its receipt has been made unrestrictedly available to him. In *Cox Motor Sales Co.*, 42 B. T. A. 192, involving dividends paid credit, we said:

Even if we assume in petitioner's favor, however, that the Commissioner should have taxed to the shareholders the dividends as constructively received in 1936, it does not follow as a matter of law, however inevitable the conclusion of the syllogism would be in logic, that within the meaning of section 27 the dividends should be considered "paid" in the earlier year by the corporation. See *Black Motor Co.*, 41 B. T. A. 300, 305. The asymmetry of the taxing statutes has been the subject of frequent comment by the courts. See *Helvering* v. *City Bank Farmers' Trust Co.*, 296 U. S. 85. However desirable it may be thought on logical grounds that constructive receipt by the stockholder should imply its correlative, constructive payment by the corporation, see Paul and Mertens, 1 Law of Federal Income Taxation, 1939 Supp., § 32A.24, we are not at liberty on that account to construe the section before us in a way that would obviously pervert the intent of Congress that actual payments should be made by the corporation to justify the deduction of the dividend claimed.

See also Mertens, Law of Federal Income Taxation, §§ 10.18, 11.30, and 39.17, and I. T. 3242, C. B. 1939–1 (Part 1), p. 172.[4]

But aside from the fact that constructive receipt does not necessarily involve constructive payment, in any event we see no justification in the language of subsection (1) for resorting to the theory of constructive payment. As we said in the *Lake* case, *supra*:

Further, the facts of this case do not warrant the application of the doctrine of constructive payment, were such considered to be a sufficient compliance with the statute: "Constructive payment is a fiction applied only under unusual circumstances * * *." *Fincher Motors, Inc., supra.* * * *

In affirming the case just cited the Circuit Court of Appeals for the Fifth Circuit, in *P. G. Lake, Inc.* v. *Commissioner, supra*, said in this connection:

Where, as here, the definite word "paid" is used in the statute we are not permitted by the theory of fiction to give to that word an indefinite meaning as taxpayer would have us do by ingrafting on the statute the word "constructively." *Mass. Mutual Life Ins. Company* v. *United States*, 288 U. S. 269, 270, 275 * * *. *The ordinary and usual meaning of "paid" is to liquidate a liability in cash.* *Helvering* v. *Price*, 309 U. S. 409, 413 * * *; *Echert* [sic] v. *Burnet*, 283 U. S. 140, 141, 142 * * *; *Quinn* v. *Commissioner*, 111 F. (2d) 372 * * *. [Emphasis supplied.]

---

[4] I. T. 3242 indicates that includibility does not constitute payment within the meaning of section 24 (c) (1). This ruling held that certain salary expenses which were includible in the creditors' income were deductible by the debtor because section 24 (c) (2) did not apply. Despite the includibility of the item involved the question is stated as follows: "The question is presented whether * * * the entire amount * * * should be allowed * * * as a business expense *even though the entire amount was not paid during that taxable year or within two and one-half months thereafter.* * * *" [Emphasis supplied.]

In *Sanford Corporation* v. *Commissioner*, 106 Fed. (2d) 882 (certiorari denied), involving a personal holding company dividend paid credit, the court said:

It will be observed that in both the undistributed profits surtax act and the one under consideration, the dividends credit provision employs the word "paid". To relieve from tax under the circumstances of the case at bar, it is necessary to interpret the verb against its literal meaning by adding thereto the adverb constructively. Generally speaking, any extension of the unreal doctrine of attaching consequences by the fiction of a constructive something or other * * * is embarrassing to a proper development of the law. * * *

In view of the above discussion we are forced to the conclusion that "paid," as used in subsection (1), means paid in cash or its equivalent. The practical effect of this construction of subsection (1) is to place the debtor on a cash method of accounting with respect to the deductible item during the two and one-half month period of grace. Concluding, as we do, that section 24 (c) (1) requires cash payment, or its equivalent, we think it is clear that execution and delivery of a promissory note do not satisfy this requirement.

The notes herein were promises to pay compensation for Miller's services. They evidenced and promised to pay the same obligation that was accrued on petitioner's books in the taxable year. No new obligation arose by the notes transaction and no debt was paid thereby. The notes were not paid within 2½ months after the close of the taxable year. In *Eckert* v. *Commissioner*, 45 Fed. (2d) 158 (C. C. A., 2d Cir.); affd., 283 U. S. 140, the taxpayer on the cash basis gave his note to a bank in settlement of his guaranty of a corporation's note to the bank. Taxpayer claimed a deduction for a loss in the amount of the note he gave the bank in the year given. The note was not paid in that year. The Circuit Court said:

On this basis, petitioner did not lose by reason of his endorsement or assumption of a corporation's obligation to the bank by issuing his own note. His liability on the corporation's note arose by reason of the endorsement and, when he sustains a loss, it must be attributable to that alone * * *. The giving of a note does not constitute a cash payment.

In *Helvering* v. *Price*, 309 U. S. 409, the question decided and the holding of the Court are correctly set forth in the syllabus as follows:

Where taxpayer whose accounts were kept on cash basis executed and delivered to bank in 1931 notes under guaranty agreement, and in 1932 taxpayer executed to bank in settlement of taxpayer's liability a note secured by collateral, taxpayer who did not pay the note in 1932 was not entitled to income tax deduction in 1932 on the ground that he sustained "loss" in that year as result of guaranty agreement, the mere giving of the note and collateral not constituting a "payment in cash or its equivalent."

This holding was made under provisions of section 23 (e) of the Revenue Act of 1932. In that case the Supreme Court quoted the following from its decision in the *Eckert* case, *supra:*

\* \* \* As happily stated by the Board of Tax Appeals the petitioner "merely exchanged his note under which he was primarily liable for the corporation's notes under which he was secondarily liable, without any outlay of cash or property having a cash value." A deduction may be permissible in the taxable year in which the petitioner pays cash. The petitioner says that it was definitely ascertained in 1925 that the petitioner would sustain the losses in question. So it was, if the petitioner ultimately pays his note.

In *Quinn* v. *Commissioner*, 111 Fed. (2d) 372 (C. C. A., 5th Cir.), the taxpayer on a cash basis gave his note for $3,000 to an accounting firm in full payment of a business expense, under agreement with the firm and a bank that the latter was to accept the note as credit on the firm's debt to it and charge same to taxpayer's account. The note was not paid in the taxable year. Taxpayer sought to deduct it in that year. It was held that, since "at no time during the taxable year did Salisbury pay any cash with respect to the accounting obligation," he was not entitled to the deduction. In its opinion the court quoted from *Helvering* v. *Price, supra*, as follows:

As the return was on the cash basis, there could be no deduction in the year 1932, unless the substitution of respondent's note in that year constituted a payment in cash or its equivalent. There was no cash payment and under the doctrine of the *Eckert* case \* \* \* the giving of the taxpayer's own note was not the equivalent of cash to entitle the taxpayer to the deduction.

See also *Massachusetts Mutual Life Ins. Co.* v. *United States*, 288 U. S. 269; *Hart* v. *Commissioner*, 54 Fed. (2d) 848; *Sanford Corporation* v. *Commissioner, supra; John C. Cleaver*, 6 T. C. 452. Mertens, Law of Federal Income Taxation, vol. 4, § 26.02, note 17, states in this connection:

It seems unlikely that payment of the items by a promissory note, alleged to be received in complete satisfaction, would be an effective technique of securing a deduction without an actual transfer of cash. To effectuate the purposes of the amendment, the courts would probably place a restrictive interpretation upon the word "paid" and deny the deduction in such a case. \* \* \*

In *Schlemmer* v. *United States*, 94 Fed. (2d) 77, the court, speaking through Judge Learned Hand, said:

\* \* \* Indeed, it is not at all clear that it (the obligor's note) would have been a cash item, even if it had in fact been taken as payment. It did not change the substance of the debt—not being endorsed or secured—and although it was more readily disposable, that single incident was scarcely enough. There must be more than difference in the mere form of property to justify a charge of income. \* \* \*

To interpret "paid" as paid in cash or its equivalent, is not a restricted interpretation, since that is its usual and customary meaning. We see no necessity or warrant for extending the usual and accepted meaning of "paid" to include "constructively paid" or to include a promise to pay, particularly when such an expanded and unnatural construction breeds confusion, uncertainty, administrative difficulties,

and a meaning subversive of the apparent purpose of the statute. Accordingly, we hold that the deduction for compensation to Miller was properly disallowed under the provisions of section 24 (c).

### Chelsea Housing Corporation Stock Issue.

Petitioner contends that the 1,958 shares of Chelsea stock which it received in May 1939 in return for capital contributions became worthless in the calendar year 1940. Petitioner relies on certain facts and circumstances, which will presently be considered, as establishing the worthlessness of the stock as of 1940.

Respondent contends that this stock did not become worthless in 1940. Respondent argues that petitioner has failed to sustain its burden of proving the necessary elements to establish worthlessness in 1940. We think respondent must be sustained.

Petitioner offered the testimony of expert witnesses to show that the book value attributed to Chelsea's assets in 1940 was greatly in excess of its actual value. The values determined by these witnesses varied from approximately $800,000 to $300,000, depending on various assumptions. Petitioner argues from this line of testimony that the value of Chelsea's assets was such in 1940 as to render its stock without liquidating value, but lack of liquidating value of and by itself does not conclusively establish the worthlessness of stock for income tax purposes. *Iron Fireman Mfg. Co.*, 5 T. C. 452, 460; *Cooley Butler*, 45 B. T. A. 593, 601. Despite current lack of liquidating value, stock may have prospective value. The question of the prospective value of the stock in question will be considered herein in due course. Secondly, petitioner has failed to prove that the lower asset value contended for was not also a fact in 1939 or some other year. In other words, petitioner has not shown, even assuming the validity of the values contended for, that the stock became worthless in 1940 rather than in 1939 or some other year. As we held in *Roosevelt Investment Corporation*, 45 B. T. A. 440, 456:

We are of the opinion that the petitioner has failed to prove an essential fact necessary for a finding by us that the stock became worthless in the taxable year, namely, that the stock had value at the *beginning* of the taxable year. *Frank C. Rand*, 40 B. T. A. 233. Unless the stock had value at some time in the taxable year there could be no loss sustained due to the stock *becoming* worthless in that year. For failure of petitioner First Realty to sustain the burden of proof in this matter we uphold respondent on this issue.

We think this reasoning is applicable to the instant case. *San Joaquin Brick Co.* v. *Commissioner*, 130 Fed. (2d) 229; *Hull's Estate* v. *Commissioner*, 124 Fed. (2d) 503; certiorari denied, 316 U. S. 690; *Alvin J. Spring*, 4 T. C. 248; *Dudley R. Parsons*, 4 T. C. 525.

Petitioner places great reliance on the local tax assessment made in November 1940 as an identifiable event signaling the destruction of the

stock's value. Petitioner argues that news of this assessment came as a culmination to a chain of adverse circumstances and constituted the death rattle of Chelsea. We are not persuaded by this argument. In the first place the assessment valued Chelsea's assets at $850,000, which can not be considered confiscatory in view of the $875,000 mortgage. In the second place, the assessment was made as a basis for local taxes to be levied, not in 1940, but in 1941. The rate of taxation on the assessed value was not known or determined in 1940. In 1940 there was the possibility of appealing such assessment. This was in fact done with success. In no event could the assessment result in any direct financial injury to Chelsea in 1940. We do not think that a prospective and contingent expense can be considered an event establishing worthlessness. As said in *New York Water Service Corporation* v. *Hoey* (U. S. Dist. Ct., S. Dist., N. Y., 4/6/43) :

\* \* \* An event which indicates the imminence of loss but not the present fact of loss does not meet the test enunciated by the cited authorities. *Burdan* v. *Commissioner*, 106 Fed. (2d) 207.

What we said in *Daniel J. Ryan*, 19 B. T. A. 52, is equally applicable to petitioner's argument in this connection in the instant case. "In any event, this argument, founded on prospective losses which are based on future contingencies, seems to us to be purely speculative." For these reasons we conclude that the local tax assessment can not be considered as an event establishing the worthlessness of the stock in question in 1940.

Petitioner argues that the refusal of certain banks and lending agencies to accept Chelsea stock as collateral in 1940 is indicative of the stock's worthlessness in that year. Nonacceptance of stock as collateral has been held as not conclusive of worthlessness. *Royal Packing Co.* v. *Lucas*, 38 Fed. (2d) 180. There are many considerations, other than worthlessness, which might prompt conservative business minds to refuse a given stock as collateral. Chelsea's balance sheets for the fiscal years ended March 31, 1940 and 1941, show an excess of current liabilities over current assets. This unfavorable current ratio might well constitute grounds for refusing such stock as collateral, although total assets exceeded total liabilities, indicating a net worth. But even if nonacceptance as collateral were considered as indicative of worthlessness, petitioner has again failed in its proof to confine such worthlessness to 1940. We are not shown whether such stock had collateral value, for instance, in 1939. Consequently, we find the same difficulty in this connection as we found with respect to petitioner's argument that the stock had no liquidating value in 1940. In both instances petitioner has failed to identify the process of becoming worthless with the year 1940.

Petitioner's remaining arguments to establish the stock's worthlessness in 1940 involve and rely in general upon the financial difficulties of Chelsea during 1940 and the depressed rental market in that year. Petitioner, in argument, recites that Chelsea was in default on its mortgage, behind on its accounts payable, operating at a loss, and facing poor business conditions in general. It can not be denied that these facts and circumstances present an unfavorable situation. Financial difficulties and depressed business conditions, however, though no doubt discouraging, fall short of establishing the worthlessness of the stock involved. Few are the enterprises which at some time or other do not face difficulties and discouragement. It has frequently been held that such factors as deficits, operating losses, lack of working funds, poor business conditions, and similar circumstances are insufficient in themselves to establish the worthlessness of stock. *Hull's Estate* v. *Commissioner, supra; Coleman* v. *Commissioner*, 81 Fed. (2d) 455; *Deeds* v. *Commissioner*, 47 Fed. (2d) 695; *Charles O. Middleton*, 25 B. T. A. 484, 487; *Elliott R. Corbett*, 28 B. T. A. 46, 51.

The inconclusiveness of much of petitioner's proof is traceable to its failure to dissipate the possible element of prospective value for the stock. Petitioner's arguments based on the alleged lack of liquidating and collateral value of the stock and its argument depending on financial difficulties just discussed are inconclusive as a result of this failure. The principle is now well settled that in cases such as the instant one the taxpayer to prevail must show that the stock in question had no potential or prospective value. In *Sterling Morton*, 38 B. T. A. 1270, at 1278, we said:

The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation.

The present record, in our opinion, fails to point out an identifiable event or any other circumstance which persuasively negatives the possibility of potential value. The project was not completed until July 1940. From July to December 1940, inclusive, the number of occupied units rose from 74 to 209 out of a total number of 261 units. In other words, 6 months after completion the project had achieved 80 per cent occupancy in difficult times. Since the project, during 1940, was in such early stages of its operations, we think it incumbent

on petitioner to point to an identifiable event which clearly signals a destruction of prospective or potential value. In our opinion, petitioner has not succeeded in doing this. Failure to make such showing is particularly damaging to petitioner's case in view of the fact that FHA, as insurer of the mortgage, did not consider it necessary to assume possession and control until August 1941. It is also significant that the mortgagee did not foreclose until 1942. Petitioner has shown that serious financial difficulties obtained in 1940, but this falls short of establishing the elements necessary to prove worthlessness. *Hull's Estate* v. *Commissioner, supra; Bullard* v. *United States*, 146 Fed. (2d) 386; *Cooley Butler, supra; Walter H. Goodrich & Co.*, 40 B. T. A. 960; *Sterling Morton, supra.* We hold that petitioner has failed to sustain its burden of proving that this stock became worthless in 1940. It follows that respondent correctly disallowed the deduction.

There remains the question involving the 390 shares of Chelsea common no par stock which petitioner received on July 5, 1940, in partial payment on its construction contract. Respondent contends that this stock is includible in petitioner's 1940 income at $100 a share. Petitioner contends that this stock was either worthless when received, and could not therefore constitute income, or became worthless during 1940 and, if included as income, increases petitioner's loss *pro tanto*. We have decided that this stock was not worthless during 1940. It follows that the value of the 390 shares received as partial compensation constitutes taxable income to petitioner. Respondent has determined the value of such shares when received by petitioner at $100 each. This valuation is based on the price paid by petitioner for the 1,958 shares in 1939. This is also the value at which this stock was carried on Chelsea's books. On the record before us we are unable to say that respondent's valuation is incorrect. The evidence presented by petitioner on this issue has not only failed to establish worthlessness, but has also failed to furnish us with any fact which would justify or enable us to determine a lesser value with any reasonable assurance. We consequently hold respondent's valuation as correct.

*Ogontz Housing Corporation Stock Issue.*

Petitioner contends that the 449.6 shares of Ogontz stock did not have any market value when received in August 1940 and, therefore, did not constitute income for that year. Respondent has determined that these shares were worth $100 each when received. After carefully considering all the evidence presented, we have found as a fact that this stock was worth $71 a share when received by petitioner.

Respondent's determination is prima facie correct and petitioner has the burden of proving such determination erroneous. We think there

is sufficient evidence in the record to overcome the prima facie correctness of respondent's valuation.

While the evidence available does not, in our opinion, sustain petitioner's contention that the stock had no market value when received, it does, we think, succeed in overcoming the presumptive correctness of respondent's determination. Petitioner's witness, Idell, testified that he unsuccessfully attempted at various times during 1939 and 1940 to sell his shares of Ogontz stock. Idell testified that a broker dealing in unlisted securities was unable to sell these shares at any price. Petitioner, in argument, relies heavily on this evidence of nonsalability as proving no market value. While we do not think this line of testimony is without significance, we think it falls short of establishing a total lack of value for income tax purposes.

In the first place, nonsalability does not necessarily indicate lack of market value. *Crowell* v. *Commissioner*, 62 Fed. (2d) 51; *Old Colony Trust Co.* v. *Commissioner*, 59 Fed. (2d) 168; *Nolting* v. *Tait*, 3 Fed. Supp. 686; *Mathilde B. Hooper, Administratrix*, 41 B. T. A. 114, 129. This is particularly true with respect to unlisted stock of a closely held corporation, especially when such corporation is a new enterprise. In the second place value in terms of marketability is of less significance in determining the value of stock received as compensation than it is in other situations, such as, for instance, determining gain or loss from exchanges of property. *Nolting* v. *Tait, supra.*

Petitioner's witnesses, Wootton and Mae Hale, valued the physical assets of Ogontz at $508,484 and $700,000, respectively, as of December 31, 1940. If either of these valuations were substituted for the $1,114,470 value appearing in the balance sheet of Ogontz as of March 31, 1941, a deficit would result, with no liquidating value attributable to the common stock. Petitioner argues from this line of testimony that the stock had no market value because of the insufficiency of the underlying assets. We do not, however, feel bound by the opinions of these witnesses, particularly in view of the fact that the bases of their opinions were outlined only in generalities. Furthermore, as we said concerning the Chelsea stock, lack of liquidating value of itself does not necessarily establish worthlessness. *Iron Fireman Mfg. Co., supra; Cooley Butler, supra.*

Idell, on direct examination and cross-examination, testified that in 1939 petitioner, represented by Miller, paid $8,270 in return for 116.4 shares of Ogontz common stock, or approximately $71 a share. Idell's testimony explains that this arrangement was agreed to as a result of negotiations concerning the terms of Idell's compensation for his services as architect. We have based our finding of value to a considerable degree upon this transaction. We recognize that this transaction does

not represent and is not equivalent to an unfettered sale on an open market. But we do consider this transaction as embodying the essential features of a payment of stock for services at a stipulated price. Section 19.22 (a)–3 of Regulations 103 provides, *inter alia*, that "If the services were rendered at a stipulated price, in the absence of evidence to the contrary such price will be presumed to be the fair value of the compensation received." Under this regulation, in the absence of contrary evidence, stock accepted in satisfaction of a stipulated compensation would be presumed to be equivalent in value to the stipulated compensation. The presumption is based on the apparent agreement of the parties on the stock's value. In the instant case, in our opinion, there exists this same basis for presumption. It is true that Idell's stipulated compensation is not known, but we do know the value of the stock agreed on by the parties with respect to such compensation. Consequently, we think that the transaction between Idell and Miller furnished essentially the same basis for presuming value which the quoted regulation indicates as proper in the absence of contrary evidence. *Crowell* v. *Commissioner, supra; Old Colony Trust Co.* v. *Commissioner, supra; Nolting* v. *Tait, supra.*

In cases such as this, where there have been no sales, and the enterprise is new and lacks any pattern of earnings or dividends, the determination of stock value is extremely difficult. This difficulty, however, does not warrant a finding of no value or justify a random finding of high value based on subscription prices. We have concluded that the transaction between Idell and Miller, which, although occurring prior to 1940, is closer in time to 1940 than the subscription payment, constitutes the most satisfactory evidence of value contained in this record. This transaction, we think, furnishes a criterion of value approved by the regulations for situations wherein market value is obscure for lack of sales. This value roughly approximates the stock's liquidating value based on assets and liabilities reflected in the balance sheet as of March 31, 1941. After carefully weighing all the available evidence bearing on the value of the stock when received by petitioner, we have concluded and found as a fact that $71 a share best represents the value as indicated by the record before us. We hold, therefore, that the 449.6 shares received by petitioner in 1940 are includible in its taxable income for that year at $71 a share.

### Foster Park Housing Corporation Stock Issue.

Petitioner contends that the 67.64 shares of Foster stock received by it in 1940 were worthless when received and did not therefore constitute income in that year. Respondent contends that these shares were includible in petitioner's 1940 income at $100 a share.

Respondent's determination is prima facie correct and petitioner has the burden of proving such determination erroneous. We think

petitioner has failed to meet its burden of proof on this issue. Petitioner's principal witness on this issue was Morton Keast, the project's architect. He testified that the stock was worthless in 1940. Keast's reason for considering the stock worthless in 1940 was:

Because it was a corporation that was not getting any income. The tenants had just been placed in December. There was no income for the year. Until there is a sufficient income to offset the expense, the stock couldn't have any value.

Since the project was not completed until December 1940, it is understandable that no income was realized in that year. The fact that a corporation has not yet commenced business operations is hardly an argument for the worthlessness of its stock. In 1941, the first year of operations, profits were made and a net worth indicated.

Keast further testified that he returned the 177.37 shares of Foster stock received by him as income in 1940 in the amount of $7,480, or approximately at $42 a share. When asked how he reconciled this inclusion in income with his statement that the stock was worthless, Keast answered:

The reason this was done in this manner, is: In our banking statement which covers our loans as we go along, from time to time, the value of $7,480 that I put in then was the value I expected it to be worth within a year or two: and that was the reason it was put in at that time.

This explanation we find confusing and unsatisfactory. We do not consider such testimony as proving no value or even as proving a value of $42 a share.

Keast also testified that in 1941 he obtained a loan from a bank, using Foster stock as collateral. Keast testified that such loan was granted "* * * by reason of a letter in which a purchaser agreed to take it over for a small amount; the amount of the loan." We are not told the terms or amount of the loan and consequently we learn little from such testimony which would enable a determination of the stock's value.

Probably because the project was not completed until December 1940, there is no balance sheet or profit and loss statement for that year in evidence. The balance sheet in evidence showing Foster's financial condition as of December 31, 1941, shows a net worth of $101,938.80, but we are not told how many shares of stock of Foster were issued and outstanding. It is impossible for us therefore to determine a liquidating value. For the same reason we can not capitalize the earnings shown in the profit and loss statement for the year ended December 31, 1941.

On this state of the record, we are unable to conclude that respondent's evaluation at $100 a share is erroneous. We, therefore, hold that petitioner has failed to sustain its burden of proving respondent's determination erroneous. It follows that respondent correctly included in petitioner's 1940 income the 67.64 shares of Foster stock at $100 a share.

Respondent, at the hearing and by omission on brief, has apparently conceded that petitioner is entitled to carry forward as a deduction from its 1940 income certain net operating losses from 1939. We so hold.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

BLACK, *J.*, dissenting: The majority opinion declines to follow the decision of the Sixth Circuit in *Musselman Hub-Brake Co.* v. *Commissioner*, 139 Fed. (2d) 65. With respect to that case the majority opinion says:

With due respect to the Circuit Court of Appeals for the Sixth Circuit, which decided the *Musselman* case, we believe its interpretation of section 24 (c) as therein given does not reflect the intent of Congress and we here respectfully record our disagreement with the holding that the facts in that case constituted payment within the meaning of such section.

I do not agree that the *Musselman* case was wrongly decided by the Sixth Circuit. On the contrary, it is my view that it was correctly decided and should be followed in the instant case because it is precisely in point. It seems clear that when Congress enacted section 24 (c) of the Internal Revenue Code it was endeavoring to correct an abuse which had grown up where corporations which were family corporations within the definition of 24 (b) frequently accrued certain liabilities such as compensation and interest as being owed to their stockholders, took deductions therefor, and never paid such liabilites, and, therefore, the stockholders on the cash basis never returned such amounts as taxable income.

That situation is not present in the instant case. It is true, of course, that the corporation is a family corporation within the definition of 24 (b) and therefore section 24 (c) (3) is applicable. It may also be assumed, as the majority report holds, that the compensation was not unconditionally credited to the account of Anthony P. Miller in 1940 so as to make the amounts taxable to him in that year under the doctrine of constructive receipt. See *Michael Flynn Manufacturing Co.*, 3 T. C. 932. It is true that the facts show that Anthony P. Miller did actually return for taxation in 1940 the amounts of his compensation which had been accrued as a liability by the petitioner corporation. I am willing to assume, however, that the amounts of this compensation had not been unconditionally credited to Anthony P. Miller in 1940 in such a manner as to make applicable the doctrine of constructive receipt and that his return of the income in that year for taxation was error.

I, therefore, agree that section 24 (c) (2) is applicable, as the majority opinion holds. I do not agree, however, that section 24 (c) (1)

is applicable to exclude the deduction, as the majority opinion holds.

The findings of fact show that on January 1, 1941, petitioner executed its demand notes payable to Anthony P. Miller for the full amounts of the compensation which had been accrued by the corporation in 1940 as a liability to him. The corporation was in ample funds to pay these notes any time Anthony P. Miller should have demanded their payment and undoubtedly as to him the compensation was paid on January 1, 1941, in property which was the equivalent of cash and he was taxable on these amounts in 1941. As the court said in the *Musselman* case:

> \* \* \* Likewise, notes or other evidences of indebtedness received for services, rents, interest or royalties constitute income to the amount of their fair market value. *Helvering* v. *Bruun*, 309 U. S. 461 \* \* \*; *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462, \* \* \*

Therefore, if the receipt of promissory notes payable to petitioner *on demand*, which were worth their face value, constituted taxable income to him when received January 1, 1941, I see no reason why the amounts represented by these notes should not be considered as "paid" by petitioner "within two and one half months" after the close of the taxable year 1940 within the meaning of section 24 (c) (1). As said by the court in the *Musselman* case:

> To construe the word "paid" to mean that the payment must be in cash, is to distort the statute. The statute here in question is not for the purpose of classifying taxpayers but is for the purpose of bringing about uniformity among taxpayers in the matter of allowable deductions.
>
> \* \* \* \* \* \* \*
>
> As we view the applicability of the statute to the facts here, it is unnecessary to place a restrictive interpretation upon the word "paid." Clearly under the rule of constructive payment, the notes with a readily realizable value of par were more than a mere accural of indebtedness on the books of petitioner.

There is nothing in the views herein expressed which is contrary to our decision in *P. G. Lake, Inc.*, 4 T. C. 1; affd., 148 Fed. (2d) 898. In the *Lake* case the corporation owed to its stockholder, P. G. Lake, a large sum of money. In 1939 it accrued on its books as a liability the amount of interest on this indebtedness and took a deduction for such accruals on its 1939 return. The corporation did not, however, unconditionally credit the amount of this interest to P. G. Lake's account in 1939 so as to make it taxable to him under the doctrine of "constructive receipt," nor did it, prior to March 15, 1940, execute promissory notes worth their face value payable to him. It actually paid such interest to Lake on May 17, 1940, by check, which was after the date required by section 24 (c) (1). We held that under those circumstances the corporation taxpayer was not entitled to a deduction for the accrual of interest in 1939. In that case we were careful to point out the distinction in its facts from those which were present in the *Musselman* case. In pointing out such distinction we said:

\* \* \* Here there is nothing more than a mere accrual of the amount due upon the books of the corporation. The amount was not ordered to be paid, nor was it credited to Lake on the books of the petitioner, nor was there any other manifestation of intention on the part of petitioner to put the amount beyond its control and within the control of Lake. It may be noted that the Circuit Court of Appeals for the Sixth Circuit in the *Musselman Hub-Brake* case was careful to point out that "the notes with a readily realizable value of par were more than a mere accrual of indebtedness on the books of petitioner."

I may further say that if an unconditional crediting, within the taxable year by the corporation, of the accrued salary to the one who is to draw it so that all he has to do is to demand the money, as in the *Michael Flynn* case, prevents section 24 (c) (2) from applying because of the doctrine of "constructive receipt," although no actual cash has passed between the parties, I see no reason why section 24 (c) (1) should not also be prevented from applying under the doctrine of the *Musselman* case when, as here, the taxpaying corporation prior to March 15 of the following year executed its "on demand" promissory notes to its officer to whom the compensation was due, and all that he had to do to get the money was to demand it. Because the majority opinion holds to the contrary, I respectfully dissent.

Another reason for my dissent to the majority opinion is because it holds that petitioner is taxable on $39,000 by reason of the receipt on July 5, 1940, of 390 shares of the capital stock of Chelsea Housing Corporation. Petitioner is claiming a deduction for $179,000 which it invested in a prior year in 1,958 shares of the Chelsea Housing Corporation stock because such stock became worthless in 1940. It also claims that it is not taxable on the 390 shares of the same stock which it received in 1940 as part of the compensation on its building contract with the corporation because such stock had no fair market value at the time it was received. The majority opinion holds that petitioner has not proved that this stock became entirely worthless in 1940, but on the contrary the evidence shows that the Chelsea Housing Corporation did not surrender possession of its property until 1941 and the mortgage on the property was not foreclosed until 1942. On these facts I am willing to go along with the majority opinion in its holding that the stock of the Chelsea Housing Corporation did not become entirely worthless in 1940. Therefore, petitioner's claim of a deduction of $179,000 for worthless stock should be disallowed. Perhaps the stock did have some potential value at the end of 1940, though I think from the evidence that value must have been very small and uncertain. However, while willing to agree to the holding of the majority that petitioner is not entitled to take a deduction of $179,000 in 1940 because of 1,958 shares of Chelsea Housing Corporation stock becoming worthless in that year, I am unwilling to agree to the majority holding that petitioner should be taxed on $39,000 as income received in 1940.

represented by 390 shares of the Chelsea Housing Corporation stock at $100 per share, received July 5, 1940. Respondent's own revenue agent, reporting on the value of this stock, had this to say:

It may be noted that also in the contract by taxpayer for the construction of the Chelsea Village apartments, taxpayer received in addition to the cash consideration of $897,783.00, Common stock of the Chelsea Housing Corp. (which owns the Chelsea Village), in the amount of 390 shares. However in this instance, the examining agent holds that the stock had no value, since this development was a failure, and as a matter of fact was foreclosed upon in 1942 by the sheriff, and as early as 1941, a voluntary Trusteeship was created to try to work out the situation, but failed.

I agree, of course, that petitioner could not prevail in this case against respondent's determination on this issue by merely introducing the revenue agent's report. Petitioner makes no such contention. Petitioner has introduced much evidence, as shown by the findings of fact in the majority opinion bearing upon the value of this Chelsea Housing Corporation stock in 1940. It would make this dissenting opinion too long to discuss these facts in detail and I shall not do so. Suffice it to say that I think these facts clearly show that this Chelsea Housing Corporation stock had no such value as $100 per share or any value near that amount when petitioner received the 390 shares on July 5, 1940. The majority opinion, as I construe it, does not affirmatively hold that the stock had a value of $100 per share in 1940 when it was received. The majority opinion in the concluding part of its discussion of this point says:

* * * On the record before us we are unable to say that respondent's valuation is incorrect. The evidence presented by petitioner on this issue has not only failed to establish worthlessness, but has also failed to furnish us with any fact which would justify or enable us to determine a lesser value with any reasonable assurance. We consequently hold respondent's valuation as correct.

I am unable to agree with this conclusion at all. I think this is no lack of evidence case. Petitioner has introduced much evidence which I think bears upon the valuation of this stock when petitioner received it in 1940 and that this evidence shows clearly that the determination of the Commissioner that the stock had a value of $100 per share on the basic date is wrong. We, therefore, should not sustain it. Cf. *Helvering* v. *Taylor*, 293 U. S. 507. From the facts given in the majority report I should say that the shares of stock in question had a value of only a small fraction of the $39,000 which the Commissioner has determined and we should find a value much less than the $100 per share which the Commissioner has determined.

I respectfully dissent.

VAN FOSSAN, LEECH, KERN, OPPER, and HARLAN, *JJ.*, agree with this dissent.