Pivaronas Bros. Bakery, Inc. v. Commissioner.
Pivaronas Bros. Bakery v. Commissioner
Docket No. 13496.
United States Tax Court
1948 Tax Ct. Memo LEXIS 118; 7 T.C.M. (CCH) 565; T.C.M. (RIA) 48148; August 13, 1948
Samuel Kaufman, Esq., and Nicholas Komlyn, C.P.A., for the petitioner. Stanley W. Herzfeld, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves deficiencies of $1,297.66 in income tax and $12.47 in declared value excess profits tax for the calendar year 1943. The issue is whether the respondent erred in disallowing as deductions under the provisions of section 24(c) of the Internal Revenue Code, certain amounts as compensation for services of petitioner's president. The stipulation of facts filed by the parties is incorporated herein by reference and made a part hereof. Findings of Fact The petitioner, a Pennsylvania corporation kept its books of account and filed its returns with the collector for the twenty-third district of Pennsylvania on the calendar year and accrual basis. At all times material, Peter Pivaronas was president and had complete charge of the activities of petitioner. He and his wife owned 796 of the total of 1,000 shares of its stock outstanding. The salary of petitioner's president was $50 a week and 2 percentum of gross sales. *120 During the year 1941. salary in the amount of $2,600 was actually paid to Pivaronas. Petitioner's general ledger and double entry accounting system was established prior to March 15 in 1942 as of January 1, 1942. In 1942 but prior to the filing of a return for 1941, petitioner credited as of January 1, 1942, to an account captioned "Accrued Salary" additional salary of $4,228 based upon 2 per centum of sales in 1941. During 1942, petitioner charged to its accounts as compensation for its president, amounts totaling $6,435, of which $2,600 in weekly installments of $50 was paid to him. After December 31, 1942, but before the return for 1942, was filed, the remainder of $3,835, based upon 2 per centum of sales for 1942, was charged to "Salaries and Wages" and credited to the accrued salary account as of December 31, 1942, by the following journal entry: Salaries and wages
$3,835
Due P. Pivaronas
$3,835
In 1943, petitioner charged on its accounts as compensation for its president amounts totaling $6,185, of which $2,650 was paid to him in 1943 by weekly installments of $50. After December 31, 1943, and before filing its return for 1943 petitioner charged the *121 balance of $3,535, based upon 2 percentum of sales in 1943, to "Salaries and Wages" and credited the account entitled "Accrued Salary" as of December 31, 1943, by a like journal entry. On May 10, 1943, and June 26, 1943, petitioner paid to Pivaronas by check the amounts of $2,238 and $1,000, respectively, and charged the amounts to its "Accrued Salary" account. The petitioner delivered to its president a check dated March 14, 1944, in the amount of $1,000. The check was paid on March 31, 1944, by petitioner's bank and was charged to an account captioned "Accrued Salary." The stub of the check bears the notation "March 14, 1944, Peter Pivaronas wages, $1,000." During 1944 credit entries aggregating $3,450 were made in the account for accrued salary of petitioner's president based upon sales, and the account was charged with $2,504 during the same period, leaving a credit balance of $9,306 in the account at the close of the year. The returns of Pivaronas for 1941, 1942, and 1943, which were prepared on the cash basis, included in gross income as compensation received from the petitioner the amounts of $6,828, $6,435, and $6,185, respectively. The balance sheets of petitioner at *122 the close of 1941, 1942, and 1943 were as follows: ASSETS
1941
1942
1943
Cash
$ 1,610.60
$ 3,990.60
$ 3,366.00
Accounts Receivable
459.83
267.43
246.75
Drivers' Balances
439.33
137.02
Inventory
13,422.46
13,515.15
14,202.56
Fixed Assets
40,921.71
45,877.12
46,152.12
Prepaid Vehicle Licenses
144.50
119.25
$56,414.60
64,234.13
$64,223.70
LIABILITIES
Accounts Payable (Involces)
$ 7,870.62
$10,531.15
$ 9,676.14
Accounts Payable (Equipment)
2,350.00
Notes Payable (Bank)
3,000.00
4,000.00
1,600.00
Drivers' Bonds
600.00
700.00
Accrued Taxes
1,468.26
967.72
877.10
Income Tax Deductions
358.10
Due Officer
4,228.00
8,738.00
8,535.00
Reserves for Depreciation
17,317.69
19,500.71
23,069.41
Capital Stock
25,000.00
25,000.00
25,000.00
Surplus (Deficit)
(2,469.97)
(7,453.45)
(5,592.39)
$56,414.60
$64,234.13
$64,223.70
Pivaronas owned real estate which he had acquired at a cost of $66,000. In 1942, he purchased a farm at a cost of $7,000 and paid $5,000 cash on the cost and gave a mortgage for the remainder. At the close of 1941 Pivaronas was receiving rental income from his real estate, *123 had ample funds for living expenses, and no great need for other money, and desired petitioner to have on hand sufficient funds to pay operating expenses. He was of the opinion that he could obtain the salary owed him at any time he desired payment. Prior to 1941, petitioner borrowed $6,000 from the Polithania State Bank, Pittsburgh, Pennsylvania, on the demand judgment note of petitioner and Pivaronas. The unpaid balance on the note on December 31, 1941, and March 15, 1942, was $3,000 and $2,400, respectively. In July 1942 when the unpaid balance on the note was $1,600 petitioner borrowed an additional $3,400 from the same bank and gave it a new note in the amount of $5,000. The unpaid balance on the new note on December 31, 1942, March 15, and December 31, 1943, and March 15, 1944, was $4,000, $3,400, $1,600 and $1,000, respectively. Petitioner had agreed to pay the loans at the rate of $200 a month. The final payment on the loan was made in August 1944. It had no other bank loans. Petitioner's cash balances on the dates shown were as follows: Petitioner's
Date
Records
December31, 1941
$1,610.60
March 14, 1942
2,228.08
March 15, 1942
$2,228.08
December 31, 1942
3,990.60
March 14, 1943
2,118.19
March 15, 1943
2,094.93
December 31, 1943
3,366.00
March 14, 1944
3,561.54
March 15, 1944
242.30
*124 The petitioner kept a daily record of sales. During the years 1941 to 1944 inclusive, companies engaged in the production of flour offered credit to petitioner and a director of the Polithania State Bank informed Pivaronas that he could borrow money at the bank if he desired to make a loan. The Polithania State Bank had a capital stock of $200,000 and surplus of $75,000, $77,000, and $80,000 at the close of 1941, 1942, and 1943, respectively. The only financial statement filed by petitioner with the Polithania State Bank was dated January 17, 1941. Such a statement is regarded as current for about one year for the purpose of making bank loans. The cashier of the Polithania State Bank was the chief executive officer of the bank and received applications for loans from the bank. Applications for loans were submitted to the directors of the bank or the bank's executive committee, which consisted of the directors, president, and cashier, for final action. Petitioner had a checking account with the bank. The cashier had knowledge of the financial condition of petitioner and its president and at any time from the close of 1941 until March 15, 1944, would have recommended to the board *125 of directors or the executive committee the granting of a loan to petitioner in the amount of $8,000 or $10,000. In its income and declared value excess profits tax returns for 1941, 1942, and 1943 the petitioner claimed as deductions the amounts of $6,828, $6,435, and $6,185, respectively, as compensation for the services of its president. The returns for 1941 show normal tax net income of $2,176.99 and the return for 1942 reported a net loss of $4,809.98. The return for 1943 reported a net loss of $2,948.92, in connection with which petitioner claimed a net operating loss deduction of $4,809.98 based upon the net loss shown in the returns for 1942. Of the deduction of $6,435 taken in 1942, $2,600 was shown as officer's salary and the remainder of $3,835 was included in other salaries and wages. The deduction of $6,185 taken in 1943 was included in a deduction of $58,697.52 taken for salaries and wages. In his determination of the deficiencies, the respondent disallowed the deductions claimed by petitioner in 1941, 1942, and 1943 as compensation for the services of its president and increased petitioner's income in 1941 by adjustments of deductions in the net amount of $2,027.50. *126 Opinion The sole question here is whether the accrued portion of the salary of petitioner's president for each of the years 1941, 1942, and 1943 is deductible from gross income under the provisions of section 24(c) of the Internal Revenue Code. [1] The years 1941 and 1942 are involved on account of deductions authorized by section 122 for net operating losses. *127 All of the conditions set forth in the applicable statutory provision must coexist to prevent the deductions. On brief, no contention is made by petitioner, except in the alternative as to 1943, that subsections (1) and (3) do not apply. With respect to subsection (2) its contention is that the accrued salaries were constructively received by the officer and, therefore, includible in his gross income. The fact that the amounts were included in the income tax returns of Pivaronas is not decisive. The creditor was on the cash basis of reporting income and our question was whether the amounts were includible in his returns. Anthony P. Miller, Inc., 7 T.C. 729, reversed on other grounds 164 Fed. (2d) 268. Pivaronas was in active charge of the affairs of petitioner and fixed his own salary. As such executive he was in a position to fix the time and terms of payment of his salary, and the manner of recording it on petitioner's books. Notwithstanding the fact that daily records were kept of sales, the salary based upon sales, that being the only portion in controversy, was not accrued on the books until after the close of the year and was not entered in an *128 account kept in the name of the officer. The accrual for the salary for 1941 was entered as of January 1, 1942, in connection with the establishment of a general ledger and a double entry system of books. The facts are evidence that the amounts were not set apart for the creditor and beyond the control of petitioner. Anthony P. Miller, Inc., supra; Van W. Peabody, 5 T.C. 426. However, petitioner argues that ability of the creditor, as the head of petitioner, to pay himself the amounts at any time is equivalent to a crediting thereof without restrictions on withdrawal. No contention is made by the petitioner that cash was available at any time to pay the salaries in full. It relies upon credit to make cash available for payment. There is testimony of Pivaronas that he could have paid himself the accrued salaries at any time by obtaining a bank loan or buying flour on available credit. The record shows that the cashier of the Polithania State Bank would have recommended a loan up to $10,000 and there is testimony of Pivaronas that at some undisclosed time in 1941, 1942, 1943, and 1944, a director of the bank informed him that "* * * if I wanted any of my *129 money I could borrow it." Such evidence is not proof of the ability of petitioner to obtain at any time bank loans of sufficient amount to pay the salaries in question. A bank loan was increased in July 1942 from $1,600 to $5,000, but no part of the additional loan was used to pay the accrued salaries. The record does not disclose the amount of credit petitioner had with companies from which it purchased flour. Such credit was not used for the purpose of paying the salaries in question. To the close of 1943, only $3,238 of the total accruals of $11,598 involved herein, were actually paid and the payments aggregating such amount were not made until May and June 1943. The inference is that the creditor, for himself and as the officer in control of the affairs of petitioner, concluded that the amounts would not be withdrawn until an indefinite time in the future when they could be paid without use of credit or financial hardship to petitioner. This is further substantiated by the record of accruals and payments during 1944, when quarterly accruals totaling $3,450 were made and only three payments, aggregating $2,504 were made, leaving a credit balance of $9,306 in the account as of *130 the close of the year. In any event from the record we can not find that any time was ever fixed for payment. Ohio Battery and Ignition Co., 5 T.C. 283, relied upon by the petitioner is distinguishable. In that case the salaries were accrued at the close of each year, and were available to the officers at any time, and there was proof of sufficient bank credit, without security, to obtain funds to pay the salaries in cash. No such proof was made here. Other cases cited are likewise open to distinction. Petitioner contends in the alternative upon brief that subsection (1) does not apply to the year 1943, and, as grounds, asserts that the payment of $2,238 on May 10 and $1,000 on June 26 of that year covered amounts currently accrued in 1943. The liability of petitioner to its president for salary in 1943, computed on the basis of sales, was not accrued on the books until after the close of the year, and was then entered as of December 31, 1943. Petitioner alleges that the liability accrued as the sales were made. The proof here is only that Pivaronas was to be paid as part of his salary an amount equal to 2 percentum of sales. No proof was made that it was to be *131 accrued daily or at any other specific time or was payable on any definite period during the year. The payments were charged to the accrued salary account, an open account. No evidence was offered to establish that the payments were for current sales, rather than as partial payment of salary accrued for 1941 and 1942. Sales were entered in a ledger account as of the end of each month. The credits for the first quarter of 1943 aggregated $47,154.87 and for the second quarter, $46,304.59, on the basis of which Pivaronas was entitled to compensation, based upon sales, of $943.10 and $926.09, respectively. The payments made bear no relation to such amounts. On the other hand, there is indication that the payments, totaling $3,238, with the payment of $1,000 in March 1944, were made under the supposition that they paid the accrued portion of the salary of $4,228 for 1941. Upon, the record made we are unable to find any error in the respondent's determination that the accrued salaries are not deductible. Accordingly, Decision will be entered for the respondent. Footnotes
1. (c) Unpaid Expenses and Interest. - In computing net income no deduction shall be allowed under section 23(a), relating to expenses incurred, or under section 23(b), relating to interest accrued - (1) If such expenses or interest are not paid within the taxable year or within two and one half months after the close thereof; and (2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and (3) If, at the close of the taxable year of the taxpayer or at any time within two and one half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under section 24(b)↩.