**MAHLER et al. v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 159.**

Circuit Court of Appeals, Second Circuit.

May 19, 1941.

Harry Friedman, of New York City, for petitioners.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and F. E. Youngman, Sp. Assts. to the Atty. Gen., for respondent.

Before SWAN, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

This proceeding involves deficiencies in income taxes of the petitioners for the years 1934 and 1935, for each of which they filed a joint return. The principal question is whether they are entitled to deduct as a loss sustained during either of those years the cost of certain shares of preferred and common stock of Middle West Utilities Company previously purchased by them. Benjamin Mahler owned 1,300 shares of common stock having a cost basis of $24,144.32, and his wife owned 65 shares of preferred with a cost basis of $6,500. They claim that the stock became worthless in 1934 or, in the alternative, in 1935. The commissioner disallowed the deduction on the ground that the stock was not worthless prior to 1936. The Board found that it became worthless in 1932.

The petitioners argue that in so holding the Board decided an issue not raised by the pleadings and thereby rendered a decision in violation of due process of law. They contend that having disproved the commissioner's allegation that the stock did not become worthless before 1936, they have established their right to a deduction for 1934 or, in the alternative, 1935. This contention cannot be sustained. Section 23(e) of the Revenue Act of 1934, 48 Stat. 689, 26 U.S.C.A. Int.Rev.Acts, page 672, permits the deduction from gross income of "losses sustained during the taxable year * * * if incurred in any transaction entered into for profit * * *." In seeking a deduction the taxpayer has a burden greater than merely proving the commissioner wrong; he must establish the essential facts from which a correct determination can be made. Burnet v. Houston, 283 U.S. 223. 227. 51 S.Ct. 413, 75 L.Ed. 991; Reinecke v. Spalding, 280

U.S. 227, 233, 50 S.Ct. 96, 74 L.Ed. 385; Saxman Coal & Coke Co. v. Commissioner, 3 Cir., 43 F.2d 556, 557; see also Taylor v. Commissioner, 2 Cir., 70 F.2d 619, 621. When the deduction is based on stock becoming worthless in a given taxable year, the taxpayer must show facts proving that worthlessness occurred in that year. Squier v. Commissioner, 2 Cir., 68 F.2d 25, 27; Keeney v. Commissioner, 2 Cir., 116 F.2d 401, 403. The issue raised by the pleadings was whether the stock became worthless in either 1934 or 1935. It would have been enough for the Board to make a negative finding that it had not. Keeney v. Commissioner, supra. Having found that the stock became worthless in 1932 the Board necessarily found that it did not become worthless in either of the taxable years in suit. If that finding is supported by substantial evidence this court must accept it. Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 79 L.Ed. 1343; Bartlett v. Commissioner, 4 Cir., 114 F.2d 634, 639.

The petitioners contend that it is not so supported. This requires a study of the evidence, consisting of the testimony of two witnesses and many voluminous exhibits. All the evidence was put in by petitioners. Only a brief summary of it can be given. Middle West Utilities Company was a gigantic public utilities holding company. Its assets consisted almost wholly of investments in and advances to numerous subsidiary corporations of which some were subholding companies and others operating companies. On April 15, 1932 a federal district court in Illinois appointed equity receivers for Middle West on the ground of its inability to finance its obligations. At that time the book value of the company's assets was over $308,000,000 with liabilities of approximately $73,000,000; thus the books disclosed an equity for stockholder interests of more than $235,000,000. The stock outstanding was approximately 607,-400 shares of preferred with a par value of $100 a share and 15,942,113 shares of common without par value but with a stated value of $10 a share. The receivership continued until July 23, 1934, when the receivers were superseded by a trustee appointed in reorganization proceedings under Section 77B of the Bankruptcy Act, 11 U.S.C. A. § 207, upon a petition by creditors which alleged that the company had free assets not exceeding $20,000,000 and liabilities of about $70,000,000. During the pendency of the receivership and reorganization proceeding extensive write-downs of the assets of the company were made from time to time until the book equity of more than $235,000,000 was completely wiped out. An appraisal made as of July 23, 1934, pursuant to court order, found that the liabilities exceeded the assets by more than $10,000,000. On November 27, 1935, the district court confirmed a plan of reorganization based on a valuation of $18,000,000 for the assets to be transferred to the new company and liabilities of about $65,000,000. The court found specifically that as of July 23, 1934, Middle West was insolvent and that no equity existed for either preferred or common stockholders. Hence acceptances by the stockholders were not required for the confirmation of the plan; nevertheless the plan provided that preferred stockholders who surrendered their old certificates for cancellation should receive one share of $5 par value stock of the new company and a warrant to purchase one additional share for each four shares of old preferred stock surrendered. It also provided that common stockholders who surrendered their old certificates for cancellation should receive one share of new common and a warrant to purchase an additional share in exchange for each 100 shares of old common stock surrendered. The warrants gave holders the right to purchase a new share of stock on a sliding scale beginning at $8 per share. Whether or not the petitioners surrendered their old stock for new does not appear.

Following the receivership of the parent company several of its subsidiaries went into receivership or bankruptcy in 1932 and the early months of 1933. By June, 1933, Middle West's investment in subsidiaries already in receivership was approximately $100,000,000, and in 1934 two more subsidiaries representing an investment of approximately $48,000,000 were placed under the control of receivers. During Middle West's receivership several groups of interested parties, as well as its receivers, prepared reports of the financial condition and future prospects of the company. In the latter part of 1932 a committee for common stockholders sent out an optimistic report. Even more optimistic was a report by a committee for preferred stockholders under date of July 10, 1933. This stated that the book value of the stock, as shown by a balance sheet prepared by independent auditors, indicated "a book value of slightly under $100 per share for the preferred

stock." The first report of the receivers on June 5, 1933, stated that reductions had been effected in the expenses of the parent company and its operating subsidiaries, and the financial condition of the Middle West system had been materially strengthened with a total improvement in liquidity of over $10,000,000 since the date of receivership. Attached to the receiver's report was an audit by a firm of accountants showing the position of the parent company as of December 31, 1932. The assets had been written down to $149,180,425.84 and the equity for preferred and common stock was stated as $60,400,089.64, subject to further adjustments. Up to this time the only pessimistic report was one issued in November, 1932, by a committee for the noteholders. Excluding investments in subsidiaries then in receivership, they appraised the assets of Middle West at some $13,500,000 and its liabilities at $57,000,000; but their report stated that it "does not pretend to present the 'fair and reasonable' value of the assets". It was presented "as an ultra-conservative view of the situation upon the assumption that all assets, whether pledged or not, were to be sold at present 'break up' prices and the company liquidated", which the committee did not expect would happen. The petitioner Benjamin Mahler testified that despite this report he believed in 1932 that his stock had value. In June, 1934, the same firm of accountants who had reported for the year 1932 submitted to the receivers a report as of December 31, 1933. This showed that $205,000,000 had been written off, reducing the assets to $91,674,338.32 and leaving a stated equity for stock of only $16,218,669.06. This report was accompanied by a statement that further writedowns were probable. This prediction proved correct. As already stated, the receivers were superseded on July 23, 1934, by a trustee in reorganization and on that date, as the bankruptcy court subsequently found, the company was insolvent.

The problem of fixing the date as of which the stock of Middle West became worthless is of peculiar difficulty in such a case as this because the mere fact of a receivership or reorganization proceeding is not alone sufficient to fix the date of worthlessness. A. R. Jones Oil & O. Co. v. Commissioner, 10 Cir., 114 F.2d 642, 646. Nor is the date of worthlessness necessarily that on which the final order of confirmation or liquidation is entered. See Hobby v. Commissioner, 5 Cir., 97 F.2d 731; Lambert v. Commissioner, 10 Cir., 108 F.2d 624. In establishing the date of worthlessness, the taxpayer is aided by the rule that the date is to be fixed by "identifiable events" which form the basis of reasonable grounds for abandoning any hope for the future. See United States v. White Dental Co., 274 U.S. 398, 401, 47 S.Ct. 598, 71 L.Ed. 1120; Olds & Whipple, Inc. v. Commissioner, 2 Cir., 75 F.2d 272, 275. The taxpayer cannot be an "incorrigible optimist" in postponing the time for claiming a deduction based on the worthlessness of stock. Keeney v. Commissioner, 2 Cir., 116 F.2d 401, 402. Nor can he postpone the date in a manner which amounts to a manipulation of his deductions to suit his income. DeLoss v. Commissioner, 2 Cir., 28 F.2d 803, 804; A. R. Jones Oil & O. Co. v. Commissioner, 10 Cir., 114 F.2d 642, 646. In general the taxpayer may, and must, claim his deduction in the year in which events are such as to furnish convincing evidence that the stock has in fact become worthless in that year. One form of effective evidence, though not necessarily conclusive is the existence of an authoritative balance sheet showing whether assets exceed liabilities so as to leave any equity for the stock. See Sterling Morton v. Commissioner, 38 B.T.A. 1270, 1278, affirmed, 7 Cir., 112 F.2d 320. In the case at bar we think the date of worthlessness must be determined from the reports of assets and liabilities made from time to time during the pendency of the receivership.

In finding the year of worthlessness to have been 1932 the Board relied heavily upon the report of the noteholders' committee, stating that "while the situation in 1932 may not have been as bad as the report indicates we are of the opinion that only an 'incorrigible optimist' could have formed an opinion that there was any real value to the common or preferred stock." This was not, however, the view of the Board when the same question was first presented to it in the case of Horning v. Commissioner, 35 B.T.A. 897. There the taxpayer's claim that the stock of Middle West Utilities Company became worthless in 1932 was disallowed, notwithstanding the report of the committee for noteholders. Later the same issue was presented in the case of Peabody v. Commissioner, 38 B.T.A. 1086, where all the evidence introduced in the Horning case was again before the Board "together with important additional evidence." There the Board sustained the

taxpayer's claim that the common and preferred stock was worthless at the close of 1932. The record in the Peabody case was not introduced in the case at bar but the Board states that the facts in evidence are substantially the same. In the eyes of the Board the peculiar virtue of the report of the committee for noteholders lay in the fact that later events proved it to have been remarkably accurate, but the evidentiary force of the report as an "identifiable event" proving worthlessness must depend on the weight to be attributed to it as of 1932 and not at a later date when its prophecy has been verified by the event. See Forbes v. Commissioner, 4 Cir., 62 F. 2d 571, 573. It was but one of several reports which the stockholders studied, was avowedly ultra-conservative and based on an assumption of immediate liquidation at "break-up" prices. On the other hand, reports of the committees for stockholders and the receivers' first report of June 5, 1933, were far from discouraging. The latter would properly carry particular weight with stockholders since it expresses the views of men appointed to run the business for all interests and to state the facts as they see them without regard to the hopes or fears of particular interests. The receivers' report disclosed an apparent equity as of December 31, 1932, of nearly $100 per share for the preferred stock, after very extensive write-offs of book values. To say that only an "incorrigible optimist" could believe the preferred stock had any value at the close of 1932 is not, in our opinion, justified by the record. The Board buttresses its finding by stating that the record "is replete with incidents and occurrences" establishing worthlessness in 1932, but what they are is not specified. Doubtless the Board had in mind the 1932 receiverships of subsidiaries in which the parent company had investments of more than $90,-000,000, but as already stated the fact of receivership does not of itself establish worthlessness of the investment.

■ Though the record does not support the conclusion that all equity of the stockholder interests became worthless prior to 1934, in our view it is necessary to differentiate between the common and the preferred stock. The receivers' first report showed as of December 31, 1932, an equity for stock which was $300,000 less than the sum to which preferred stockholders would be entitled in liquidation, and stated that it was subject to further adjustments. As of December 31, 1933, the report of Arthur Andersen & Co. attached to the receivers' second report valued the stock equity at only some $16,000,000. In 1934 this had disappeared and the company was declared insolvent. The Board's finding that the common stock became worthless prior to 1934 is supported by substantial evidence. It is otherwise in our opinion as to the preferred stock. We think the petitioners proved that they were entitled to a deduction of $6,500 on account of the preferred stock becoming worthless in 1934.

■ The final question presented by this appeal is whether the petitioners are entitled to deduct as "taxes" the sums paid to the city of New York as "water rents" upon premises owned and occupied by them as a residence. These sums, $40.50 in each of the years in suit, represent a flat annual charge payable in advance during the month of January. It appears from the receipts introduced in evidence that the city charges 15 cents per 100 cubic feet when the water is measured by meter, and charges "frontage rents on premises wholly or partly unmetered", the charge varying with front footage of the building, number of stories, particular use, etc. In urging that frontage rents are taxes the petitioners rely upon New York University v. American Book Co., 197 N.Y. 294, 297, 90 N.E. 819, 820, which differentiates between metered service and a frontage rate, stating that in the former case the user of water owes the city a debt but in the latter the obligation to pay "is created by the exercise of the taxing power of the local authorities." The Board, however, held that the charge was not a tax within the meaning of section 23(c) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev. Acts, page 672. Its opinion cites authorities from numerous states to the effect that water rents or charges are not considered taxes and states that such has been the consistent ruling of the internal revenue department for many years. See 3 C.B. p. 139. The petitioners desired water supplied to their residence; that the amount they must pay for it was fixed by local ordinance does not, in our opinion, give their obligation the character of a tax within the meaning of the Revenue Act.

The order in respect to the year 1935 is affirmed; the order in respect to the year 1934 is reversed and the cause remanded for redetermination of the tax in conformity with this opinion.