ESTATE OF C. L. HAYNE, DECEASED, KATHLEEN HAYNE PHILLIPS, SURVIVING WIDOW AND USUFRUCTUARY, KATHLEEN HAYNE FOLTZ, WILLIAM P. HAYNE AND C. L. HAYNE, JR., CHILDREN AND LEGAL HEIRS, AND KATHLEEN HAYNE PHILLIPS, SURVIVING WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 39721.    Filed April 26, 1954.

*Junius H. Payne, Jr., Esq.*, and *Grove Stafford, Esq.*, for the petitioners.

*Robert B. Wallace, Esq.*, for the respondent.

118

OPINION.

### Issue I. Stock Loss, $4,000.

JOHNSON, *Judge:* The general contention of petitioners under this issue is that the stock became worthless in 1948, even though the corporation did not discontinue all of its activities until after the sale of its assets on March 1, 1951, after which steps were taken to dissolve. The circumstances must be exceptional to hold in such a situation that the stock ceased to have value in 1948. *Bullard* v. *United States*, 146 F. 2d 386.

The corporation had operating losses in 1947 and 1948. But financial difficulties, even of a serious nature, do not establish worthlessness. *Anthony P. Miller, Inc.*, 7 T. C. 729, 748. The primary contention of petitioners is that the corporate assets had no greater value in 1948 than $29,000, the amount for which they were sold in 1951. Petitioners assert that such value, and the presence of other conditions, constitute identifiable events which establish that the stock became worthless in 1948.

If the corporation had disposed of its property in 1948 for $29,000, there would have been no equity for the stockholders. The assets were not sold or placed on the market in 1948 for that amount, and considering all of the evidence we can not find that they had decreased in value to that extent.

It is evident that the administrative officers of the corporation, among whom was the decedent, did not at any time in 1948 abandon hope that something could be salvaged from the venture for the stockholders. In December of the taxable year the theater was leased for a term of 1 year at an annual rental of $3,600 with an option to buy for $45,000. The parties canceled the lease before the expiration of its term. In August 1949 it was released for another term of 1 year from September 1, 1949, at a monthly rental of $275 with an option to purchase for $35,000. On March 1, 1951, 6 months after the expiration of the term of the lease, the lessee purchased the property for $29,000. It appears that the property earned rental income for more than 2 years after the taxable year and the corporation removed the property from the general market during that period by giving

the lessees options to purchase at prices in excess of $29,000. The transactions disclose the opinions of the officers on the value of the assets in the light of prior operating losses under their management of the theater.

Their opinions in that regard are shown by other actions on their part. The property was placed on the market for an undisclosed period of time in 1948, prior to November 18, for $45,000, but no offers were received. It does not appear that the corporation had the property on the market at any time in 1948 for less than $45,000 or that it would have accepted an offer at that time under that figure. It was not until the first part of 1949 that it placed the property in the hands of a realtor for less than $45,000, and then at $35,000. It is not understood how the corporation could have properly offered it at that time or during the term of the second lease at any price, in view of options granted the lessees to purchase.

The two realtors, with whom the property was listed for sale in the early part of 1949 at the price of $35,000, testified that upon being requested by decedent's widow in 1951 to express an opinion on the offer then being considered for the purchase of the property for $29,000, they advised her to accept. Other of their testimony is that the property had no greater value in 1948. One of them doubted whether he could have sold it for more than $29,000 in 1947. Their opinions are weakened by an absence of proof that they had like opinions when they endeavored to sell the property for a greater figure. One of the witnesses admitted that he was familiar only "casually" with the property and the other witness testified that "we didn't know too much about the machinery." The equipment and furniture and fixtures of the theater were being carried on the books of the corporation at the close of 1948 at a cost of about $20,800.

Testimony of Ione Woodard also is relied upon to establish worthlessness of the stock in 1948. She testified that she tried in 1948 to sell or give away her 40 shares of stock without success and by the close of that year considered that her investment was worthless. Notwithstanding such testimony, she did not claim a loss on her stock until 1951. Moreover the extent of her effort to sell or give away the stock is not shown.

Petitioners' burden was to overcome the presumptive correctness of the finding of respondent that the stock did not become worthless in 1948. Considering all of the evidence, we conclude that they have not met their burden. Accordingly, the action of respondent will not be disturbed.

### Issue II. Loss on Notes, $1,800.

It was alleged in the petition that the amount involved in the issue was $1,800. The stipulation of the parties is that the assessments

involved in the question were in the amount of $1,700, and no greater amount is now being claimed as a deduction. Petitioners contend on brief that the $1,700 is deductible as a business expense or loss or, in the alternative, as (1) a business bad debt or (2) a nonbusiness bad debt. The position of respondent on brief is that the payments constitute additional cost of the stock and that any deduction allowed must be because the shares became worthless in 1948.

The amounts were paid under pro rata assessments made by the corporation to obtain funds with which to pay interest on a mortgage note bearing endorsements of the stockholders and unpaid amusement taxes, including a penalty, and interest thereon. The respondent determined that no notes were given by the corporation for the payments, a conclusion supported by the evidence here, and, in effect, that the amounts constituted additional cost of stock arising from assessments made against the shareholders.

Stock assessments represent additional investments of capital. *Harry E. Lutz*, 2 B. T. A. 484; *John G. Paxton*, 7 B. T. A. 92; *B. Estes Vaughan*, 17 B. T. A. 620. Payments made by a stockholder to protect his interest are accorded the same treatment. *W. F. Bavinger*, 22 B. T. A. 1239; *Estate of William H. Foster*, 9 T. C. 930.

The stipulation of the parties and the evidence shows that the amounts were levied by the corporation and paid by the shareholders as assessments to pay obligations for which it was liable. The fact that the shareholders were secondarily liable for the interest because of their endorsements on the note of the corporation is not decisive. It does not appear that the bank or the collector had demanded, or threatened to demand, payment of the interest or taxes, primary obligations of the corporation, by the shareholders. Instead of waiting until such time as they might be called upon to pay the obligations as endorsers of the note and as stockholders, they chose to satisfy their liability to the corporation under the stock assessments to enable it to pay its debts. The corporation did not issue notes for the payments and its books do not actually reflect debts to them for the amounts. Such treatment of the transactions in the corporate records is evidence that it did not regard the payments as advances or loans, subject to repayment as payables.

The question is factual. *Pollak v. Commissioner*, 209 F. 2d 57, is distinguishable. There the payments were made in fulfillment of a preexisting legal obligation when the corporation was insolvent. No insolvency existed here in 1948, as shown by our conclusion under the first issue. The proof here amply supports the respondent's determination that the stock was not worthless in 1948, and, consequently, decedent sustained no loss. That conclusion renders unnecessary any discussion of the other points raised by petitioners, for if we are cor-

rect in concluding that the payments constitute additional cost of the stock, the amounts are not deductible as expenses or bad debts.

*Issue III. Medical Expenses, $3,000.*

The sole point involved in the issue is whether the cost of the elevator is includible in the computation of a deduction for medical expenses under section 23 (x) of the Code. Petitioners contend that the expense was incurred to comply with a prescription given by the physician in treating the mental and physical condition of the decedent. Respondent's position is that the cost was a capital expenditure and, as such, nondeductible as a medical expense under the conclusion reached in *John L. Seymour*, 14 T. C. 1111, which involved replacement of a coal burning furnace by an oil burner, because of an allergy of the taxpayer there to coal dust and ashes.

The conclusion reached in the *Seymour* case is based upon the broad principle that nothing was found in the statute or its legislative history declaring the intent of Congress to abandon the general concept of income tax law that capital expenditures are not deductible as expenses. No specific contention is made here by petitioners that the cost of installing the elevator was not a capital expenditure. They seek to avoid the force of the respondent's contention by pointing out that the elevator reduced, rather than increased, the value of the residence.

An amount expended for an asset having a life in excess of a year is usually classified as a capital expenditure. *First National Bank of St. Louis*, 3 B. T. A. 807; *W. B. Harbeson Lumber Co.*, 24 B. T. A. 542. The elevator involved here was presumably used by the decedent until his death in 1949 and was still affixed to the property at the time of the hearing. The fact that it was not used by others after the decedent died is not determinative of the nature of the expenditure. The facility was installed at a time when there was urgent need for such a means of transportation and improved the property to meet the requirements of the decedent at the time. It is reasonable to assume that he would be using the elevator at this time if he were alive and had not recovered from the ailment that induced the outlay. Thus, after the decedent was stricken it was found that the family residence no longer had all of the facilities necessary to take care of the needs of the occupants, and to improve it to transport the decedent from one floor of the house to another with greater ease and comfort, an elevator, a capital improvement, was installed.

Whether an expenditure was for a capital addition to property or constitutes an expense does not depend upon whether or not it increased the value of the property. *Popular Dry Goods Co.*, 6 B. T. A. 78; *Bonwit Teller & Co.*, 17 B. T. A. 1019; *Harriet B. Borland*, 27

B. T. A. 538; *Connally Realty Co.*, 31 B. T. A. 349, affd. 81 F. 2d 221. See *Difco Laboratories, Inc.*, 10 T. C. 660. The true test being the nature of the expenditure, without regard to whether the value of the property was increased thereby, the character is not changed by the fact that the outlay does not result in ultimate advantage to the taxpayer. *Parkersburg Iron & Steel Co.* v. *Burnet*, 48 F. 2d 163, affirming 17 B. T. A. 74; *Chicago & North Western Railway Co.*, 39 B. T. A. 661, affd. 114 F. 2d 882.

Under the authorities cited we think the cost of the installation of the elevator undoubtedly was a capital expenditure and hence is not deductible under section 23 (x). However, if not a capital expenditure, under the facts it is not clear that the cost of the elevator is deductible as a medical expense.

The meaning of section 23 (x) was discussed at considerable length in *Edward A. Havey*, 12 T. C. 409. We concluded there that only such amounts as were incurred primarily for the prevention or alleviation of a health or body condition may be claimed as medical expenses, an incidental benefit not being enough. Consideration of the history and purpose of the statute in a later case resulted in a like conclusion. *L. Keever Stringham*, 12 T. C. 580. See *Frances Hoffman*, 17 T. C. 1380. Each case must turn on its peculiar facts.

The attending physician had known the decedent since 1930 and prescribed for his physical ailments on several occasions after about 1944. He testified from personal knowledge that the decedent "had always been a very demanding man for all types of services" and that after the attack in 1948 "he was even worse about everything done, sometimes without reason as far as I was concerned."

In response to a direct question on the treatments he prescribed for the decedent, the doctor testified that "There were no specific treatments, we gave him symptomatic treatment as far as medication was concerned and in addition to that he had a physiotherapist that gave him physiotherapy every day." That testimony can not be construed to include, as part of the medical treatments, trips outside of the home or downstairs, with or without the use of an elevator. The absence of such trips as part of the treatment prescribed by the physician is borne out by his response to the second following question as to any other treatment, to which the doctor replied by saying: "Well, he had three nurses there with him all the time, then after he decided that he would like to go outside we made an attempt to get him downstairs and out in the backyard, * * * and because we let him go down once, why, he felt as though he was a lot better and in appearance he was better because he felt as though he was progressing," and "he made a lot of demands about going out in the yard and also taking automobile trips which I thought was all right and I suggested that he continue to do that." That testimony shows that it was the decedent who de-

cided upon the trips downstairs, and he was permitted to do so with the acquiescence and not by order of the doctor as part of any of his prescribed treatment for the decedent's ailment. A few questions later, in response to a question as to whether the automobile trips were "a treatment that you prescribed," the physician merely testified, "Yes I prescribed that he could go down to his office and we would have to get the ambulance."

Other testimony on the point does not alter the effect of the testimony just related, which is that the trips outside and to the first floor were permitted to satisfy wishes of the decedent and were not upon order of the physician as part of his treatment of the patient. None of the evidence is that the trips were considered necessary as part of the medical treatment of decedent other than the incidental effect that they had on the mental attitude he had about his illness.

Neither does the installation of the elevator appear to have altered the situation in that regard. It was installed at the suggestion or advice of the doctor. As to why he suggested the elevator, the physician testified, in effect, that as the trips were helping decedent and were apparently improving his mental condition aggravated by the stroke and subsequent confinement, he considered that the installation of an elevator would be the easiest way out of the problem of using the stairway.

Concerning the subject of whether the installation of the elevator was reasonably necessary in connection with his treatment of the decedent, the physician testified, quite indefinitely, as follows:

It was my opinion that this man might live a normal span of life, that he might recover enough to go back to his regular business and even if he recovered mentally enough but he wasn't recovering as far as his paralysis was concerned, and this would be a long-range thing as far as he was concerned to have this elevator there. It would certainly be a means of transportation if he had fully recovered from his paralysis and his mental depression.

The use of the elevator was not intended to have and had no beneficial effect upon the mitigation or cure of the paralytic condition of the decedent. Its primary function was to solve a transportation problem, resulting from wishes of the decedent to get out of his room, which were merely incidental to the illness.

Our conclusion, from careful consideration of all of the evidence on the point, is that the installation and use of the elevator were never prescribed to alleviate or mitigate any ailment of the decedent and that the cost was incurred primarily for purposes having only an incidental relation to the illness. As such, they must be regarded as personal expenses, nondeductible under the statute.

Accordingly, we find that no error was committed by the respondent in disallowing the deduction.

*Decision will be entered for the respondent.*