OPINION. HakRon, Judge: Issue 1. — Flamingo Hotel Company. The first question is whether the preferred and common stock of Flamingo Hotel Company became worthless in 1949, prior to July 14, or prior to September 15, when the common stock was sold for $1 a share. This question was raised for the first time by the pleadings. Deductions for worthless stock are claimed under sections 23 (e) and (g), as limited by section 117, Internal Revenue Code of 1939. The second question, which is presented only in the petitions of members of the Lincoln family, is whether sales of Flamingo common stock were made directly or indirectly between members of a family within the scope of the provisions of section 24 (b) (1) (A), Internal Revenue Code of 1939. Worthlessness of Flamingo stock: Whether property becomes worthless in a particular taxable period is a question of fact. John B. Marsh, 38 B. T. A. 878, 902; Cooley Butler, 45 B. T. A. 593, 600. The question is to be determined from a practical common sense consideration of all the evidence. Lucas v. American Code Co., 280 U. S. 445, 449; Boehm v. Commissioner, 326 U. S. 287; Miami Beach Bay Shore Co. v. Commissioner, 136 F. 2d 408, 409; John B. Marsh, supra. The burden of proof is upon the taxpayer to establish in a convincing manner that the stock has in fact become worthless in the taxable period in which the loss deduction is claimed. Mahler v. Commissioner, 119 F. 2d 869, 872; Cooley Butler, supra. Where the time of the loss is not fixed by a closed and completed transaction, the date is to be determined by reference to “identifiable events” which evidence the destruction of value both actual and potential in the period in which the loss is claimed. As was observed by this Court in Sterling Morton, 38 B. T. A. 1270, affd. 112 F. 2d 320, at page 1278: The ultimate value of stock, and conversely its worthlessness will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some “identifiable event” in the corporation’s life which puts an end to such hope and expectation. Petitioners contend that the common and the preferred stock of Flamingo Hotel Company had neither liquidating nor potential value as of July 14, 1949. They argue that the corporation was insolvent as of June 30, 1949, and that a series of events which occurred in the forepart of 1949 destroyed any reasonable basis for hope or expectation that the shares then outstanding would acquire any value in the foreseeable future through continued operations of the company. The question whether the stock became worthless in 1949, prior to September 15, 1949 (the date on which the common stock was sold for a nominal consideration pursuant to a plan of financial readjustment), is important (1) in determining the net income or loss of the partnership for its final period of operations ended July 14, 1949; and (2) in determining whether the Lincoln petitioners are entitled to loss deductions from worthlessness of stock rather than from sales of the common stock, the respondent having determined that section 24 (b) precludes the allowance to them of loss deductions from sales of stock. The partnership would be entitled to a loss deduction with respect to the stock only in the event that it is held that the stock became worthless during its final period of operations since the partnership was terminated before the preferred stock was surrendered to the corporation for cancellation and the common stock was sold for a nominal consideration. The petitioners seek to establish that the corporation was insolvent and that the stock was without liquidating value, through expert testimony. They claim that, although the balance sheet of the corporation as of June 30,1949, showed an excess of assets over liabilities in the amount of $41,720, the assets, specifically the Flamingo Hotel property, were not worth book value. The Flamingo Hotel property had a book value on June 30, 1949, of $1,277,518. Two expert witnesses, E. C. Keefer and S. Z. Bennett, made a joint appraisal of the hotel property in April 1952. They each expressed the opinion that on or about July 1, 1949, the fair market value of the Flamingo Hotel, including real and personal property, was $850,-000. Also, William H. Bemis, a director and general counsel of the company since its organization, testified that in his opinion the fair market value of the property on July 1, 1949, was not more than $1,000,000. Bernis’ testimony concerning the value of the property was based upon his general knowledge of hotel property and management, and upon his familiarity with the property in question since its acquisition by the corporation. The testimony of the expert witnesses about the fair market value of the property in question has been carefully considered. However, their opinions about value are, under the issue before us, only one element to be considered in determining whether the stock of Flamingo corporation was worthless in 1949 before July 14, or September 15. If we were to give their testimony a great deal of weight, their testimony, at best, would tend to support a conclusion that the stock was' without liquidating value on or about the critical dates. But that fact, of itself, would not be sufficient to establish that the stock was worthless. Furthermore, if we were to assume for purposes of argument that both classes of Flamingo stock were without liquidating value on the critical dates, there remains the question whether the stock, on those dates, had potential value. Sterling Morton, supra. The absence of liquidating value of itself is insufficient to establish worthlessness. Anthony P. Miller, Inc., 7 T. C. 725, 745, affirmed on this point 164 F. 2d 268, certiorari denied 333 U. S. 861; Estate of C. L. Hayne, 22 T. C. 113, 118. The evidence does not establish that, in spite of the existence of recurring net operating losses aggregating $233,279 as of June 30, 1949, impairment of capital, and a distressed financial condition, there was no hope or expectation on the part of the officers and directors of the Flamingo corporation in the early part of 1949 and on or about July 14, 1949, that continued operations of the hotel property could not be carried on, or that continued operations would not eventually result in creating an equity for the stockholders. In Anthony P. Miller, Inc., supra, p. 747, it was pointed out that It has frequently been held that such factors as deficits, operating losses, lack of working funds, poor business conditions, and similar circumstances are insufficient in themselves to establish the worthlessness of stock. * * * Macklin Operated, Inc., a stockholder and the supervising agent of the hotel, advanced funds to the Flamingo corporation between July 1 and September 15, 1949, to meet fixed charges and incidental expenses. Flamingo corporation was not in default in its first mortgage payments (and never was in default) ; it was able to secure, in the summer of 1949, a rescheduling of its second mortgage payments; it also obtained from Cleveland Trust Company a renewal of the note evidencing its indebtedness to that bank. The corporation was not placed in receivership either before, during, or after 1949. It did not cease operations. Upon consideration of all of the evidence, it must be concluded that the petitioners have failed to establish that the potential value of the Flamingo stock must be deemed to have been destroyed in 1949. One of the cases cited by petitioners, Henry Adamson, 17 B. T. A. 17, is clearly distinguishable on its facts. In the Adamson case, the stockholders authorized and actively sought a sale of the corporation’s assets in the year in which it was claimed that stock became worthless, and the evidence showed that the price at which the stockholders endeavored to sell the assets would be insufficient, if realized, to satisfy the corporation’s debts. In these proceedings, similar evidence is lacking. Petitioners cite and rely upon Jeffery v. Commissioner, 62 F. 2d 661, and Homer M. Preston, 7 B. T. A. 414. These cases are distinguished on the facts from the case at bar. In the Jeffery case, the corporation was adjudged a bankrupt in the year in which the loss deduction for worthless stock was claimed. In the Preston case, the evidence established that the financial and commercial position of the corporation was hopeless in the year in which the loss deduction for worthless stock was claimed, although the corporation continued in business for several years thereafter. Petitioners point with emphasis to the fact that the plan of financial readjustment which was outlined in the corporation’s letter to stockholders, dated August 9, 1949, was accepted by all the stockholders and was carried out by them. Pursuant to the plan, all the preferred shareholders surrendered their stock to the corporation for cancellation between August 10 and September 15, 1949, and all the holders of the common shares sold their stock for $1 a share on September 15, 1949. With the exception of the 7shares of common stock which were acquired by John Lincoln upon-liquidation of the Gordon Macklin & Company partnership, the Lincoln petitioners sold their common stock to Smith, who, as part of the plan, entered into a 5-year contract with the corporation to manage the hotel. Smith, who had wide experience in the management of resort hotels, demanded an equity in the corporation before he would accept a contract to manage the hotel. The other holders of common stock sold their shares to David Lincoln, who, as part of the plan, purchased 1,000 shares of new preferred stock from the corporation for $100,000. Petitioners argue that the stockholders, by accepting the plan of financial readjustment, in effect confirmed the fact that the preferred and the common stock were then worthless. We do not agree. In the first place, the plan of financial readjustment was not formally proposed to the stockholders until subsequent to the termination of the Gordon Macklin & Company partnership. Hence, even if we were to regard the acceptance of the plan by the stockholders as an identifiable event in the life of the corporation which effectively destroyed the potential value of the stock, the partnership would not be entitled to a loss deduction for worthless stock in its final period of operations. Furthermore, the acceptance of the plan by the stockholders evidences at most that the stockholders were, at the time, either unwilling or unable to provide the corporation with the needed working capital, and that they had lost faith in the future prospects of the corporation. We note, however, that their apparent lack of faith in the future of the corporation was not shared by David Lincoln, who, as part of the plan, invested $100,000 in the corporation, nor by Smith, who, as part of the plan, agreed to devote his time and ability to managing the hotel for a period of 5 years. Finally, the fact that all the common stock was sold for a nominal consideration after the old preferred shares had been surrendered to the corporation for cancellation does not of itself establish that the common stock was then worthless. It has been held that the sale of stock for a nominal consideration does not establish the prior worthlessness of the stock. Cf. Raoul H. Fleishmann, 40 B. T. A. 672, Elliott R. Corbett, 28 B. T. A. 46. It is held that petitioners have failed to prove that the common and the preferred stock of Flamingo Hotel Company became worthless during the period January 1 to July 14, 1949, or at any time in 1949 prior to the surrender by the stockholders of the preferred shares for cancellation and the sale by them of the common shares for a nominal consideration. Sales of common stock: Section 24 (b) (1) (A), Internal [Revenue Code of 1939, provides that in computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly, between members of a family, as defined in subparagraph (2) (D). The respondent contends that section 24 (b) (1) (A) applies to the Lincoln petitioners’ sales of Flamingo common stock. He relies upon McWilliams v. Commissioner, 331 U. S. 694. Respondent does not question the amounts of the losses for which the Lincoln petitioners claim deductions. On or before September 15, 1949, all of the holders of Flamingo common stock transmitted their shares, a total of 750, to Flamingo corporation, and on September 15, each stockholder received $1 a share for the surrendered stock. David Lincoln received a certificate for 487% shares of common, for which he paid $487.50, and James B. Smith, received a certificate for 262% shares of common, for which he paid $262.50. The members of the Lincoln family owned a total of 270 shares of common, of which 7% shares are not involved under this question. David Lincoln is a member of the Lincoln family, and he comes within the definition of “the family of an individual” set forth in section 24 (b) (2) (D). Petitioners contend that there was no sale or exchange of the common stock between members of the Lincoln family, either directly or indirectly, within the scope of section 24 (b) (1) (A), and that McWilliams v. Commissioner, supra, does not apply here. It is the respondent’s view that the sales of stock by six stockholders, who are not related to any member of the Lincoln family, should be disregarded, and that the entire transaction involved indirect sales by members of the Lincoln family to David Lincoln. We conclude that the respondent’s view involves distortion of the facts and must be rejected. The sales of the common stock were part of a plan of readjustment following the death of Gordon Macklin, and of refinancing which was the outgrowth of business necessity. The plan was not conceived and carried out for the primary purpose of establishing tax losses for the stockholders. We find no basis for injecting an element of suspicion into the transactions, or for construing them as a tax avoidance device. The evidence shows that James B. Smith wanted to purchase stock in Flamingo and that part of the consideration for his agreement to become the new manager of the hotel was the right to purchase common stock. The evidence shows that one group of stockholders, the non-Lincoln group, were unwilling to invest more capital in the Flamingo enterprise. Since business needs and purposes provided the reasons for the sales of the common stock, they should not be construed to be anything other than what they were. That is to say, there were no sales, directly or indirectly, by any member of the Lincoln family to David Lincoln. We are satisfied that James B. Smith was, in fact, the actual and bona fide purchaser of the 262% shares of common stock which were held by members of the Lincoln family. He did not resell any of the 262% shares, later, to any member of the Lincoln family. He not only retained the 262% shares which he purchased in September 1949, but he also, later, purchased additional shares of common stock, namely 300 shares, on November 24, 1950. The facts here are wholly different from the facts in McWilliams, and we therefore hold that the provisions of section 24 (b) (1) (A) do not preclude deductions by the Lincoln petitioners for the losses which they sustained upon their sales of their respective lots of common stock to James B. Smith. Issue —Gordon Machlin Partnership. The question is whether John S. Lincoln, as surviving partner, purchased the interest of his deceased partner in Gordon Macklin & Company. Decision of this question determines whether the partnership realized net gain from operations during its last taxable period, as respondent has determined, and whether John S. Lincoln’s contention that he sold his partnership interest to Macklin’s estate (rather than bought Macklin’s interest) is sound. The partnership was terminated by Macklin’s death on July 14, 1949. It was engaged in the security brokerage business; it acquired for its own account securities which it inventoried. Prior to the period in question, the partnership adopted the cost method of inventory valuation; it never obtained the Commissioner’s consent to change from this method. In the partnership return of income for January 1 to July 14, 1949, the opening inventory of securities was valued at cost, whereas the closing inventory was not valued at cost but was purportedly valued at market. Because of the change in the method of valuing the closing inventory the partnership return reflected a net loss of $37,539.13 for the period. The Commissioner adjusted the closing inventory to cost, resulting in a net profit of $22,167.12. Respondent also determined, giving effect to the understanding between the partners that Lincoln was not to share in partnership income attributable to dealings with the Lincoln family, that Macklin’s distributive share of the partnership income was $19,327.16, and that Lincoln’s distributive share was $2,840.66. Petitioners agree that this determination is correct. The petitioners concede that the closing inventory of securities should have been reported at cost. However, petitioners now claim that the partnership sustained an ordinary net loss in its last period of operations for reasons which are set forth hereinafter. The petitioners contend that the partnership sustained an ordinary net loss in the amount of either $37,539.13 or $20,857.18. An ordinary net loss of $20,857.18 was sustained by the partnership if the preferred and common stock of the Flamingo Hotel Company, which the partnership held in its inventory as of July 14,1949, became worthless at some time during 1949, before July 14. Our finding that the Flamingo stock did not become worthless at any time in 1949 disposes of this contention. The other contention, that the partnership sustained an ordinary net loss of $37,539.13, requires a more lengthy explanation. In support of this contention, the petitioners advance the theory that the partnership’s closing inventory was transferred to creditors in payment of debts of the partnership, resulting in a loss of $59,706.95, the difference between the cost basis to the partnership of the closing inventory and an alleged market value thereof. If the petitioners’ theory is correct, the partnership sustained in its last period of operations a net loss of $37,539.13. For the purpose of considering this contention, it may be assumed, without deciding, that $59,706.95 was the difference between cost and the true market value of the closing inventory on July 14, 1949. Respondent does not agree that the market value of the closing inventory oil July 14, 1949, was less than cost to the extent of $59,706.95, or any other amount. The evidence is clear that the partnership as such did not enter into any transaction (such as a sale or exchange) involving the transfer of any of its assets to creditors in payment of debts upon which loss or gain can be predicated. ' Briefly, what actually happened, as is set forth in the Findings of Fact, was as follows: On August 26,1949, after Macklin’s death, Lincoln, with the consent of Macklin’s estate, filed an application in the Probate Court, as surviving partner, to purchase the interest of the deceased partner in the partnership assets, at their appraised value, in accordance with the provisions of section 8089 of the Ohio General Code. The court approved Lincoln’s application. Lincoln, under Ohio law, had a right to make such election. If he had not made such election, the executors of Macklin’s estate would have had to petition the court for the appointment of a receiver for the partnership. Sec. 8091, Ohio General Code. Lincoln’s first step prior to making the election was to petition the court to appoint appraisers to make an inventory and appraisment of the assets and liabilities of the partnership. Appraisers were appointed and their report was approved by the court. Their report of inventory and appraisement showed that, as of July 14, 1949, the partnership’s liabilities exceeded its assets by $11,355.60. Accordingly, Lincoln, as surviving partner, acquired the interest of the deceased partner in the assets of the partnership without paying any consideration to Macklin’s estate; he acquired all of the assets of the partnership and assumed all of its liabilities as the surviving partner. Having made the election to acquire the interest of the deceased partner and having thereby acquired all of the partnership assets, Lincoln proceeded to collect the assets and pay the debts of the dissolved partnership. His conduct in winding up the affairs of the dissolved partnership was in strict compliance with Ohio law.[4] Debts of the partnership were paid in the following way: Lincoln used cash of the partnership in the amount of $384,801.30, plus $3,906.53, the proceeds from the sale of certain partnership assets, plus approximately $4,700 from his personal funds, or a total of $393,457 (in round figures) to pay tlie claims of all of the creditors of the partnership other than himself. The remaining assets of the partnership, consisting chiefly of the closing inventory of securities, were retained by Lincoln in satisfaction of his claim against the partnership as a creditor. The fact that Lincoln was a subordinate creditor of the partnership to the extent of his free credit balance in addition to being the surviving partner does not change the legal effect of his election to acquire his deceased partner’s interest. Having made that election, he thereafter acquired the partnership assets as the surviving partner and not as a creditor of the partnership. Our determination of the question presented is governed by what Lincoln did in accordance with the applicable Ohio law. Petitioners have not cited any authority in support of their theory that “the partnership assets (including the inventory of securities) must be deemed to have been transferred to Lincoln as of July 14,1949, in payment of partnership indebtedness,” and we have found none. It is concluded that Lincoln, as surviving partner, purchased his deceased partner’s interest in the partnership assets. The action of the trustee of Macklin’s insurance in paying Lincoln $10,000 from insurance proceeds according to the terms of the 1940 agreements has been considered; it does not prevent or militate against the above conclusion. Both the limited partnership agreement and the insurance agreement by their terms were to expire on June 29, 1944. However, the limited partnership agreement was extended for a period of 5 years, from June 29, 1944, to June 29, 1949. The insurance agreement was not renewed or extended. Nevertheless, the insurance on Macklin’s life remained in effect and the designation in the policy of a trustee to receive the proceeds and to pay $10,000 therefrom to Lincoln was not changed. After Macklin’s death, the trustee collected the proceeds of the insurance, and on September 22, 1949, he paid $10,000 to Lincoln therefrom. The theory that Lincoln sold his partnership interest is directly opposed to Lincoln’s election as the surviving partner to purchase his deceased partner’s interest and is rejected. Furthermore, this theory fails to take into account facts relating to Lincoln’s share of unwithdrawn profits, and treats the payment of $10,000 as consideration for such share as well as the original contribution of $10,000. We think the effect which respondent has given to Lincoln’s receipt of $10,000 out of the insurance proceeds, i. e., decreasing Lincoln’s capital account by $10,000, realistically reflects what was done. Under all of the facts, it cannot be held that the partnership entered into a transaction (such as a sale or exchange) whereby its closing inventory of securities was transferred to creditors, or disposed of in any other way, at a loss of $59,706.95, or any other amount, during its last period of operations. We must reject petitioners’ contention. It follows that the partnership had a closing inventory of securities which had to be taken into account in computing the ordinary net income of the partnership for its last period of operations. It is admitted that inventories of securities were an important income-computing factor. That being so, “It follows that no accurate computation of the partnership income for the period in question, and hence of petitioners’ distributive share thereof, could be made without taking account of the closing inventory for the period.” Louis Karsch, 8 T. C. 1327, 1333. Petitioners’ theory is an attempt improperly to relate back to the partnership’s final period of operations, the transactions entered into by Lincoln, after he acquired the partnership assets as the surviving partner, in winding up the affairs of the dissolved partnership. Cf. First National Bank of Mobile v. Commissioner, 183 F. 2d 172, certiorari denied 340 U. S. 911. With respect to the assets which Lincoln retained after paying the claims of all creditors other than himself, the fact of the matter is that he took them as the surviving partner and not as a creditor of the dissolved partnership. With respect to the dissolution of the partnership and the winding up of its affairs, we must consider the question presented in the light of the election made by Lincoln, i. e., in the light of what was done rather than what might have been done (such as having a receiver appointed), which might have had other results. In view of our conclusions under the first general issue and under this issue, it follows that the partnership realized ordinary net income in its last period of operations in the amount of $22,167.82. Reviewed by the Court. Decisions will be entered under Rule 50. Sees. 8085, 8088, SOSO, and 8091, OMo General Code.