Hans Christensen v. Commissioner.
Christensen v. Commissioner
Docket No. 4253-66.
United States Tax Court
T.C. Memo 1969-112; 1969 Tax Ct. Memo LEXIS 185; 28 T.C.M. (CCH) 594; T.C.M. (RIA) 69112; May 29, 1969, Filed *185 Held: Petitioner failed to prove that his Doric Company stock and debentures became worthless in 1964. Warren V. Clodfelter, 1500 I.B.M. Bldg., 1200 Fifth Ave., Seattle, Wash., and Richard F. Kroetch, for the petitioner. Lee A. Kamp, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined a deficiency in the amount of $25,761.59 in income tax of the petitioner for the year 1964. The issues remaining for decision are whether petitioner's investment in certain stock and debentures became worthless in 1964, and if so, what was petitioner's basis in the stock. Findings of Fact The stipulation *186 of facts and the exhibits attached to the stipulation are incorporated by reference. Petitioner is a single man who resided in Seattle, Washington, at the time the petition herein was filed. Petitioner filed an individual income tax return for the calendar year 1964 with the 595 district director of internal revenue at Tacoma, Washington. On Schedule D of this return he claimed losses on stock and debentures of Doric Company, in the amount of $14,159.60 on Doric stock sold August 24, 1964, and $13,070.40 on Doric debentures sold November 4, 1964. The Doric Company was a Washington corporation organized in 1954 which operated a chain of hotels in Washington, Oregon and California. In 1964 it owned the following subsidiaries: Doric Motel Company, Cirod Gardens, Inc., Cirod Hayward, Inc., Cirod Mission Hills, Inc., Radio Center Building Co., Inc., Furniture Leasing Corporation, Dexter Horton Company. In early 1964 petitioner owned debentures of Doric bearing 4 percent interest and having an adjusted basis of $10,840.00. He also owned 5,000 shares of $5 par value Doric stock. He acquired the original stock and debentures in about August 1954 in a transaction described by Doric *187 as follows: Received:
50 shares Dexter Horton Co. Class "a" stock, value
$25,000.00
$11,000.00 Dexter Horton Bonds
11,000.00
Accrued interest
770.00
$11,230.00 in cash 11,230.00
Total value received
$48,000.00
Issued:
$23,000.00 Doric Company Bonds
$23,000.00
250 shares Doric Company $100.00 stock 25,000.00
Total value issued
$48,000.00 The 250 shares of stock were later exchanged for 5,000 shares of $5 par value stock. Some of the debentures were redeemed prior to 1964. The Doric Company was in financial difficulty in late 1963 and early 1964. An action, No. 613362, was begun early in 1964 against Doric by one of its creditors in The Superior Court of the State of Washington In and For the County of King, pursuant to section 23.01.620 of the Revised Code of Washington. This provision authorizes a compromise of debts or a reorganization of a corporation under supervision of the court if a majority in number representing three-fourths in value of the creditors agree. The Superior Court, on April 3, 1964, granted Doric permission to file a plan of reorganization and it filed such a plan. Counsel for Doric wrote the creditors of the company on *188 May 7, 1964, informing them of the plan of reorganization and requesting their acceptances of the plan and filing of claims. The letter states, in part: Insofar as the plan deals with trade creditors, it provides for payment of 30% of the claims of each in cash and the balance of each debt to be evidenced by a debenture, payable out of the cash flow of the reorganized company. The Doric Company was organized in August, 1954, and for many years operated successfully. However, with the leveling off of the real estate market in about 1959, the company found itself in financial difficulty and has been in such difficulty ever since. This was occasioned by too rapid an expansion, as a result of which the current debts of the corporation got far out of line with its current assets. For many years it has been unable to meet its obligations as they fall due. In recent years, in order to meet its current obligations, the company refinanced many of its assets and sold others. The company has now found itself in the position of having disposed of many of its assets and the remaining assets are so heavily encumbered that the company can no longer meet its obligations. In order to remedy *189 this situation, it is necessary that The Doric Company reorganize. The present plan proposes to pay thirty (30%) percent of the claim of each creditor in cash and $300,000.00 has been deposited with the Court for this purpose. The plan also provides for adequate working capital for the reorganized company. This amended Plan of Reorganization has been the result of extensive efforts by management and creditors to salvage everything possible for the creditors of The Doric Company. It is felt that it is the most fair and feasible plan that can be presented. The only alternative to the plan is liquidation of the company, which in the opinion of the writer and all persons connected with this proceeding, will result in little or no dividend to unsecured trade creditors. After further proceedings a second amended plan of reorganization was filed and was approved by the Court on July 14, 1964. The plan was accepted by creditors holding more than seventy-five percent in amount of the claims. Under the plan approved by the Court a new corporation, Motel Development Corporation, herein referred to as MDC, was to be organized. This corporation was to issue several classes of debentures payable *190 out of 50 percent of the "cash flow" of its operations. It was to receive Doric's assets. The plan provided for payment of claims of creditors and stockholders as follows: 596 ARTICLE I CLASSES OF CREDITORS AND STOCKHOLDRES OF THE doric company/ 1. Taxes accrued to the United States, State of Washington, and any sub-division thereof, as of March 31, 1964, and all debts entitled to priority under the laws of the State of Washington, and interest accrued to Equitable Savings & Loan Association as of March 31, 1964. 2. Holders of general claims as of May 1, 1964, other than F. R. Clodfelter and F. R. Clodfelter, as Trustee, and Ray J. Lemery, their nominees or assignees. 3. F. R. Clodfelter, Trustee, and Ray J. Lemery, holding secured promissory notes in the amount of $143,243.60, said notes being dated June 4, 1963. 4. Holders of The Doric Company debentures. 5. Any debt due Leamington Hotel Co.
6. F. R. Clodfelter holding unsecured obligations due from the debtor. 7. Holders of The Doric Company stock. ARTICLE II PROVISIONS FOR PAYMENT OF CREDITORS AND STOCKHOLDERS OF THE DORIC COMPANY 1. All claims included in Class 1 are to be paid in cash in full, unless *191 assumed and paid by the new company. 2. Holders of general claims in Class 2 shall, upon consummation of the plan, receive thirty (30%) percent of such claim in cash and receive a Series A income debenture of the new company for the balance of said debt. 3. Holders of secured notes issued by The Doric Company in Class 3 shall be entitled to receive Series B income debentures of the new company for the full amount of such debts. 4. Holders of claims in Class 4 shall be entitled to receive Series C income debentures of the new company for the amount of such debts. 5. Holders of claims in Class 5 shall be entitled to receive Series D income debentures of the new company for the amount of such debts. 6. Holders of claims in Class 6 shall be entitled to receive Series E income debentures of the new company. 7. Holders of The Doric Company stock in Class 7 shall be entitled to receive a pro-rata distribution of Series F debentures of the new company. The "cash flow," for purposes of the plan, was to be computed from gross receipts less operating expenses, taxes, prepaid expenses, and principal and interest on indebtedness secured by the properties transferred to the new company. *192 The series A to F debentures aggregated $2,770,000. Only series A bore interest. Series A debentures were to be paid in full before any payment was made on series B debentures. Likewise, B were payable before C and similarly with D,E, and F debentures. The F debentures which were to be issued to the stockholders, were to be the last paid. All debentures were due June 1, 1980. They were in registered form. The Court was to appoint one member of the MDC board of directors to represent the holders of A to E debentures and another to represent holders of series F debentures. Ray J. Lemery was one of the organizers and directors of Doric and was president of Doric in 1963 and 1964. He owned some 15 to 17 percent of the stock and some of the debentures. William E. Bittner was interested in the reorganization. Lemery and Bittner furnished $300,000 in cash in 1964 to carry out the reorganization. The disbursing agent appointed by the Court, Louis H. Ford, filed a report on August 28, 1964, reporting payment of $4,206.75 and $57,890.89 to class one creditors and $35,000.10 for expenses of administration. He also listed payments to be made to class two creditors amounting to $149,786.02 *193 in cash and $349,500.66 in debentures, upon approval by the Court. This report was approved on August 28, 1964. On October 30, 1964, the Court approved the second report of the disbursing agent, covering distribution of class C debentures to 50 creditors of class 4 in the amount of $750,517.14. These included petitioner, who received such a debenture in the face amount of $15,067.60. This debenture was issued by MDC under date of August 24, 1964, and carried no interest. Lemery became president of MDC. As president he addressed a memorandum to the board of directors on December 7, 1964, concerning action proposed to be taken at a meeting of the board on December 9. In this he made statements of the objectives of the management "in its attempt to perpetuate a profitable operation for the corporation." He said that the assets acquired from Doric were heavily encumbered and 597 the operation as a whole was not showing a profit, that the secured obligations exceeded $2,500,000 and required $32,500 per month to satisfy them, and that some of the properties were losing money. He proposed to liquidate the losing properties in a manner to satisfy the secured obligations. He stated: *194 "Once this was accomplished, assets remaining would show a profitable operation with tighter management control, and from this base it was and is the management's intention to build a new chain of motor hotels primarily through management contracts and lease arrangements which would not require a large capital expenditure by the corporation." In this memorandum Lemery projected a cash flow from the properties which would remain with the corporation of some $134,000 per year, and expressed the hope that a proposed sale of one property and success in certain litigation would bring in additional funds. He said that management hoped to build a large chain of hotels and motels in conjunction with Dinkler Management Corporation, which was a subsidiary of a substantial investment company, and that Dinkler was willing to enter into arrangements with MDC as a partner in the operation of Doric motels. Lemery proposed the sale of several properties, the Mayflower Hotel, the Waldorf Hotel, and a second mortgage note of the Dexter Horton Company. He also proposed a sale of capital stock of MDC to Dinkler to provide working capital for the projected operations. At the meeting of December 9, 1964, the *195 board of directors agreed to the sale of the Waldorf Hotel under certain conditions, agreed to the sale of the Dexter Horton note and to the sale of MDC stock to Dinkler. The board did not agree to sell the Mayflower Hotel but recommended improving it and authorized use of corporate funds for that purpose. On December 23, 1964, Lemery, as president of Doric, filed a "Final Report and Petition for Order of Completion and Discharge of Disbursing Agent" in the reorganization proceeding. On the same date the Court by order made certain amendments to the plan of reorganization and provisions for closing the proceeding. Pursuant to these arrangements, series B debentures bentures of MDC were issued to F. R. Clodfelter, Trustee, and to R. J. Lemery in the amount of $75,322.26 each, series D debentures to the trustees in dissolution of The Leamington Hotel Co. in the amount of $256,000, series E debentures to F. R. Clodfelter in the amount of $151,421.25, and series F debentures to the stockholders of Doric, including petitioner who received one in the amount of $18,047.20. The series F debentures issued aggregated $1,095,719.58. The disbursing agent had $48,145.33 in cash remaining, which *196 he turned over to MDC except for $3,000 retained for unforeseen expenses. Series Z debentures and capital stock of MDC were issued to Lemery and Bittner for their investment. Dinkler Management Corporation of California purchased capital stock and series Z debentures. Series Z debentures were to be paid from the cash flow of MDC not committed to payment of the A to F debentures. Petitioner received his series F debenture after January 29, 1965. Petitioner did not sell his Doric or MDC securities. The following table shows the amount of each series of debentures issued by MDC in 1964: Series
Amount
A
$ 349,500.66
B
150,644.52
C
750,517.14
D
256,000.00
E
151,421.25
F
1,095,719.58
In March 1966 one of the holders of a series A debenture of MDC petitioned the Superior Court to appoint a receiver for MDC, alleging that it was in default under the terms of the foregoing plan of reorganization of Doric. In June 1966, the disbursing agent appointed by the Court filed a Third Report disclosing receipt of proceeds of $125,000 in settlement of litigation over Surf Rider notes, and interest of $479.32. He reported payment of $23,041.50 for attorneys' fees, taxes *197 of $7,948.52, expense of $2,000 and $46,244.65, one-half the remaining balance, as distributable to the holders of class A debentures. These debentures then aggregated $378,091.37. They bore interest at 6 percent per annum. Payment was made on June 1, 1966, to the holders of principal in the amount of $6,343.07 and interest of $39,301.58. On July 1, 1966, the Court ordered that MDC be dissolved and appointed a liquidating receiver, stating that the corporation was in default under the terms of the plan of reorganization of Doric and that the interests of the Class A debenture holders required the dissolution and receivership. Opinion Petitioner claimed deductions for losses on stock and debentures of Doric on the 598 ground that they became worthless in 1964. Respondent disallowed the deductions for failure of petitioner to establish that the securities became worthless within the taxable year. If the petitioner's Doric securities, or the MDC debentures issued to petitioner in exchange for them, became worthless during 1964 petitioner is allowed a deduction pursuant to section 165 of the Internal Revenue Code of 1954[1] for the resulting loss. *198 The applicable regulations provide that to be allowable as a deduction "a loss must be evidenced by closed and completed transactions fixed by identifiable events." Income Tax Regs., Sec. 1.165-1(b). *199 Doric was in financial trouble early in 1964. One of its creditors commenced an action to collect a debt and the Superior Court permitted Doric to propose a plan of reorganization deferring payment of some of its unsecured liabilities to avoid a receivership. After negotiations a plan was agreed upon and was approved by the State Court. Petitioner filed his acceptance of the plan and received an MDC series C debenture in 1964 for his Doric debentures. In 1965 he received an MDC series F debenture on account of his Doric stock. The burden of proof is upon the petitioner to show that his Doric securities, or the MDC securities issued to replace them, became worthless in 1964. A security may not be treated as worthless if it has liquidating value, that is, - if the issuing corporation has an excess of assets over liabilities. And even when it has no liquidating value, it may still have potential value if the foreseeable operations of the corporation offer a reasonable prospect for restoration of value. *200 Both factors of value must be wiped out before the loss can be fixed. Where the liabilities are so greatly in excess of the assets that there is no reasonable hope that continuation of the business will result in any benefit to the security holders, the value has become extinct and the security is worthless. Sterling Morton, 38 B.T.A. 1270 (1938), affd. 112 F. 2d 320 (C.A. 7, 1940); Mahler v. Commissioner, 119 F. 2d 869 (C.A. 2, 1941). In Mahler it is stated that "One form of effective evidence, though not necessarily conclusive, is the existence of an authoritative balance sheet showing whether assets exceed liabilities so as to leave any equity for the stock." There is no balance sheet of Doric in evidence. The record indicates that the last balance sheet available in 1964 was dated October 31, 1963, and the latest audited one was dated November 1961. The evidence does not show the value of the Doric or MDC assets at any time. The secured liabilities exceeded $2,500,000 according to Lemery's letter of December 7, and debts evidenced by series A and B debentures of MDC amounted to $500,000 more, but without an evaluation of the assets *201 the equity of the shareholders or debenture holders cannot be determined. Where there is no authoritative balance sheet available, the worthlessness of a security may be shown by an "identifiable event" in the corporate life normally considered as effectively destroying the potential value of its securities, such as appointment of a receiver, bankruptcy, liquidation, or cessation of business. Charles W. Steadman, 50 T.C. 369 (1968), on appeal (C.A. 6 Jan. 3, 1969). Petitioner does not point out such an "identifiable event" occurring in 1964 which would be reasonable grounds for abandoning any hope for the future of the business. The proceeding in the Superior Court was not regarded by the participants as such an event. There a plan for reorganization and continuation of the business was agreed upon by a substantial majority of the creditors. Petitioner filed his acceptance of the plan and received MDC debentures issued pursuant to the plan. The attitude 599 of the promoters was hopeful. Lemery and his associates paid in additional money to carry the plan into effect with *202 a view to improving the value of the securities. The reorganization proceeding does not show that the Doric securities were worthless in 1964 when the holders received debentures in MDC to replace them and MDC was hopeful of paying the debenture holders. Petitioner relies upon the opinions of several stockholders and other witnesses who testified that the Doric securities were worthless at the end of 1964. Louis H. Ford, an accountant, was appointed by the Superior Court in April 1964 as disbursing agent in the reorganization and later as a director of MDC on behalf of stockholders of Doric. He paid the claims authorized by the Court and distributed the debentures of MDC as ordered by the Court pursuant to the plan of reorganization. He attended meetings of the directors and followed the operations of the reorganized business. He had difficulty in getting financial reports from Lemery. He testified that he considered Lemery's ideas as to the potential cash flow unsound and overoptimistic, and that he doubted that anyone except holders of series A debentures would ever get anything. In his opinion the series C debentures of MDC, which were distributed to Doric debenture holders, *203 were worthless at the end of 1964 and the Doric stock, and the rights of the stockholders to receive series F debentures of MDC for their stock were also worthless at the end of 1964. Ford was called as a witness for the respondent. Martin O. Nelson is president of a brokerage firm in Seattle which for several years between 1954 and 1964 provided a market for Doric securities. He was familiar with the fact that Doric went into a reorganization in 1964. He investigated the plan of reorganization and knew of the forming of MDC as a successor of Doric. He testified that there was no market for Doric bonds or stock or the MDC debentures issued or to be issued for them in December 1964. In his opinion the Doric stock and debentures and the MDC debentures issued to replace them were worthless in December 1964. Nelson was previously unaware of Lemery's "cash flow" estimate, but testified that such an estimate was unrealistic. John J. Nelson, an engineer, was a stockholder and debenture holder of Doric and a director. He attended board meetings at which the discussion was related to financial troubles of the company. He resigned from the board during 1964. In his opinion the Doric stock *204 and debentures were worthless in 1964. He sold his Doric stock in December 1964, 20,000 shares of $1.25 par value, 5,000 shares of $5 par value, and his debentures for $5 to establish a tax loss. Ed Rosling, an attorney, who was one of the organizers of Doric in 1954 and was an officer and a director until 1962, held stock and debentures of the company. In June 1963 he sold his stock, 22,000 shares, for one dollar. He owned Doric debentures in 1964. He testified that in his opinion the stock and the debentures of Doric were worthless in December 1964. Mrs. William A. Hupprich and her husband were stockholders and debentures holders of Doric prior to 1964. They followed the business of the company very closely. They sold their stock, 2,000 shares of $5 par value, for $1 in September 1964 with a view to claiming a tax loss. They left their Doric debentures for sale, but received no cash for them. They received a series C debenture of MDC for their Doric debentures. According to the testimony of Lemery, who was president of Doric and later of MDC, Doric was unable to pay its general creditors in early 1964 and unable to pay the amounts due upon the mortgages on its properties, and *205 if the creditors had not agreed to the reorganization Doric would have been forced into bankruptcy. In the reorganization Lemery and Bittner furnished $300,000 in cash. This was used to pay expenses of the reorganization, tax liabilities for Federal, state and local taxes, principal and interest due on indebtedness secured by property transferred to MDC, and 30 percent of the claims of the general creditors. Series A debentures bearing 6 percent interest were issued to these creditors for the remainder due them. The ultimate payment of these depended upon operating MDC at a profit, and only half the cash flow was committed to this payment. Eventual payment of any part of the series C debentures depended upon maintaining an operating profit for a sufficient period of time to pay $500,000 on series A and B debentures, plus the interest on series A. To pay the series C in full would require $750,000 more. Lemery promoted the reorganization of Doric and the incorporating of MDC. In 600 his letter of December 1964 to members of the board of MDC he projected a possible cash flow of $134,000 annually, if all steps were taken as he suggested. As principal officer he was in a position *206 to evaluate the possibilities of recovery. He testified some years later that in his opinion the stock and debentures of Doric in December 1964 were of no value, the company had no net assets, the MDC debentures, series C, received for the Doric debentures were worthless, and the debentures, series F, receivable for the Doric stock were worthless. He sold 100,000 shares of $1.25 par value Doric stock and 37,000 shares of $5 par value stock for $10, in order to take a tax deduction. He said that the money put up for the reorganization went to pay creditors and MDC was left without working capital and with no prospect of obtaining such capital. It is noted that although Lemery sold his Doric stock in December 1964 to establish a tax deduction, he retained his MDC series C debenture received for his Doric debentures. In his memorandum of December 7, 1964, he expressed optimism that with tighter management control the company would prosper and be successful. He projected an anticipated cash flow of $134,000 per year from the operations then contemplated and additional income if certain other motels could be added. The declared view of management was that the corporation would build a *207 large chain of hotels and motels in conjunction with Dinkler, which was part of a national hotel chain. The corporation was not giving up. Bullard v. United States, 146 F. 2d 386 (C.A. 2, 1944). Lemery's views in 1964 are inconsistent with a belief that the corporation was doomed and that its securities were worthless. Opinion evidence as to the date upon which a security becomes worthless is not an adequate substitute for reliable accounting evidence or an "identifiable event." The sales by some of the security holders of their securities to afford a basis for claiming a loss deduction for tax purposes do not constitute identifiable events determining the time when the securities became worthless. Keeney v. Commissioner, 116 F. 2d 401 (C.A. 2, 1940), affirming a Memorandum Opinion of the Board of Tax Appeals, and cases there cited. The regulations, as pointed out above, require an identifiable event. Otherwise, as in Morton, supra, accounting evidence may *208 show that value is extinct without an event. Petitioner has shown neither an identifiable event nor other adequate evidence of worthlessness. He has not proved that the Doric debentures or stock or the MDC debentures replacing them became worthless in 1964. Decision will be entered under Rule 50. Footnotes
1. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (g) Worthless Securities. - (1) General Rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security Defined. - For purposes of this subsection, the term "security" means - (A) a share of stock in a corporation; (B) a right to subscribe for, or to receive, a share of stock in a corporation; or (C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form. * * *↩